[No. S032736. Dec. 2, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
MAURICE BOYETTE, Defendant and Appellant.

COUNSEL

Lynne S. Coffin, State Public Defender, under appointment by the Supreme Court, Audrey R. Chavez, Deputy State Public Defender; Law Offices of Coffin & Love and Andrew S. Love for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Catherine A. Rivlin and Christina Vom Saal, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WERDEGAR, J.**—Maurice Boyette was convicted in 1993 in Alameda County Superior Court of the first degree murders of Gary Carter and Annette Devallier. (Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated.) The jury also sustained a special

circumstance allegation that defendant committed a multiple murder (§ 190.2, subd. (a)(3)) and enhancement allegations that defendant was armed with, and used, a firearm in the commission of the murders (§§ 12022, subd. (a), 12022.5, subd. (a)). The jury also convicted defendant of being a felon in possession of a firearm. (§ 12021.) On March 25, 1993, the jury set the penalty at death under the 1978 death penalty law. (§ 190.1 et seq.) This appeal is automatic. (§ 1239, subd. (b).)

After considering the claims raised on appeal, we affirm the judgment in its entirety.

## I. GUILT PHASE

### A. *Facts*

#### 1. *The Murders*

Antoine Johnson was a drug dealer in Oakland, California. Johnson, who had one glass eye and impaired vision in his other eye, befriended defendant, then 19 years old and homeless. Defendant lived with Johnson in a house on 14th Street with a man both knew as "Bishop," one of Johnson's dealers, and Donald Guillory, a habitual user of rock cocaine. On May 23, 1992, Bishop had the use of a tan or yellow, older model Lincoln Continental. Guillory borrowed the car that day to run some errands.

Kenya Lita Cook, Johnson's girlfriend, lived at 2501 Cole Street, a house notorious for its drug activity. Johnson sold drugs and kept cash and weapons at the Cole Street house. Jasmeen Banks, Cook's sister, also lived at the house, as did Marcia Surrell, defendant's mother. Victim Gary Carter sometimes stayed at the Cole Street house with his girlfriend, victim Annette Devallier. Surrell, Carter and Devallier were drug addicts.

On May 23, 1992, Cook telephoned Johnson and informed him that Carter had stolen $3,500 worth of rock cocaine and $1,000 cash from the house. When Guillory returned to the 14th Street house around 5:00 p.m., defendant and Johnson were waiting on the front steps. Johnson asked Guillory to drive them to the Cole Street house and he agreed.

When they arrived at the Cole Street house, Guillory was told to wait in the car. Defendant had to help Johnson up the stairs because he was nearly blind. After a short time, defendant and Cook emerged from the house carrying bags of clothing and put them in the trunk of the car. Defendant told Guillory to come into the house and he complied. He sat on a chair and then

moved to a couch at Johnson's request. Johnson was sitting on a long sofa and had a handgun hidden behind him. Defendant, Cook and Jasmeen Banks entered and sat down. Guillory felt tension in the air and asked what they were doing. Johnson told him they were waiting for someone. The group sat and waited; no one spoke.

Later that evening, Carter and Devallier arrived at the house. Upon seeing everyone in the living room, Carter asked, "What's up?" Johnson replied, "Where's my stuff at?" Without waiting for an answer, Johnson produced a handgun and fired four shots in Carter's direction. Carter, who was about four feet from Johnson, grabbed his side and fell. Guillory jumped up and tried to flee out the back door, but found it locked. Meanwhile, Devallier, who apparently had been in the entry when the shooting started, started to help Carter down the stairs and out of the house. Guillory looked back and saw defendant grab the gun from Johnson and say, "Give me the gun, man."

Defendant ran outside with the gun. Devallier was dragging Carter away from the house, but dropped him and ran when she saw defendant. Defendant caught her in the street. She turned to face him and pleaded, "Please, don't do it." Defendant shot her twice in the face from close range, killing her instantly. Guillory heard these two shots as he was leaving the house. He then heard two more shots and saw defendant standing over Carter's body. Defendant apparently shot Carter in the head as he lay there.

Cook helped Johnson out of the house and into the car. Defendant and Guillory then got into the car. Guillory was so unnerved by what he had just witnessed that he had trouble starting the car. Everyone became angry, and Johnson slapped Guillory's head and said if he did not drive better, the "next bullet" would be for him. Guillory eventually started the car and drove away. During the drive back to Bishop's house on 14th Street, Johnson asked about Devallier and defendant said she was "gone." Upon arriving at the house, Johnson and defendant told Guillory, "You don't know nothing, you didn't do nothing, just keep your mouth shut." Later, Guillory overheard Johnson and defendant tell Bishop, "We smoked him."

Police responded to the scene and found Carter's body on the sidewalk and Devallier's body in the street. The front door to the Cole Street house was open but the back door was locked. Both a television and the dryer were turned on. Police found five shell casings in the living room and seven in front of the house. They were Winchester nine-millimeter casings and were all fired from the same gun, a Glock Luger nine-millimeter semiautomatic pistol. Analyzing the bullet holes in the living room, police determined that the trajectories of the bullets were consistent with having been fired by someone sitting on the long sofa.

Dr. John Iocco, a pathologist, examined the bodies. He determined Devallier had been shot in the face with two bullets, either of which shot would have been fatal. Carter had been shot eight times, but only the shot in the head was disabling and fatal. The other bullet wounds (in his arms, chest, abdomen and legs) would not have immobilized him. Iocco found cocaine in both Carter's and Devallier's blood.

David Brooks, a neighbor across the street, confirmed that sometime after 11:00 p.m., he saw people struggling in front of the Cole Street house. Someone came out of the house and fired a gun at point-blank range at a male lying on the sidewalk. The gunman then went to a woman who had crawled to the middle of the street. She was on her hands and knees when the gunman shot her. It was too dark to make any positive identifications, but the killer had a build similar to defendant's. Greg Martin was across the street and heard gunshots around 11:25 p.m. He saw a large American car parked in front of the Cole Street house. A few minutes later, the car was gone.

A few days later, Guillory found himself in another of Bishop's cars with defendant. Defendant warned that he "better not say nothing about [the murders]" and threatened that if Guillory talked, he "would be next." Defendant also told him that if he was sent to jail, he would also kill Guillory's family.

### 2. The Investigation

Before June 3, 1992, Sergeant David Kozicki had received anonymous telephone calls indicating that four people were present at the Cole Street house at the time of the murders: defendant, Antoine Johnson, Jasmeen Banks and Kenya Lita Cook. Sergeant Kozicki left messages for all four and asked that they contact him. On June 3, defendant and Johnson contacted Sergeant Kozicki and made appointments to speak to him. Defendant came to the police station on June 4, waived his *Miranda* rights,[1] and gave a recorded statement. He admitted he was at the Cole Street house the night of the murders, as were Johnson, Banks and Cook. In addition, a drug dealer nicknamed "Dee" and one of Dee's friends, a man defendant did not know, also were there. Earlier, defendant said, he had heard Carter bragging he had stolen $3,500 worth of drugs from Dee. Defendant claimed Johnson had fired only a single shot at Carter but that he saw Dee and his friend kill Carter and Devallier.

After he gave this statement, police released defendant. Johnson came in the next day and gave a similar statement to police.

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974] (*Miranda*).

Police determined the true identity of "Dee" was Ronald Thomas. Seventeen years old at the time of the Cole Street murders, Thomas had escaped from custody a month before the murders and spent the entire Memorial Day weekend at his mother's home in Richmond. His sister Tonita confirmed that Thomas had spent the night of the killings at a barbecue with friends and relatives. Thomas denied participating in the killings, saying Antoine Johnson was an associate, not a friend. Although defendant claimed he had met Thomas while the two were in juvenile hall together, records showed defendant and Thomas were never in that institution at the same time.

After police released defendant and Johnson, Sergeant Kozicki received more anonymous telephone calls. The callers stated that the police should not have released defendant and Johnson since they were responsible for the killings; that Guillory also had been present and served as the getaway driver; and that by releasing defendant and Johnson, Guillory's life was now in danger. Sergeant Kozicki interviewed Guillory on June 25, 1992, and he denied any knowledge of the killings. When informed that defendant and Johnson had been released and that anonymous callers had said Guillory's life was in danger, Guillory admitted being at the scene and seeing Johnson and defendant shoot the victims.

On July 30, 1992, police arrested defendant, Johnson and Cook at the 14th Street house. (Cook was later released.) Defendant again waived his *Miranda* rights and gave two taped statements (the July 30th statements). This time he admitted he had gone to the Cole Street house with Johnson and Guillory, that Johnson believed Carter had stolen from him, that Cook gave Johnson a Glock nine-millimeter pistol that held 16 rounds, that Johnson fired several shots at Carter and then gave defendant the gun to "go get the girl," that he shot Devallier in the head after she begged him not to shoot, and that when he walked back to get in the car, Carter—lying on the ground—suddenly grabbed his leg so he shot and killed him (although defendant claimed he shot Carter in the stomach and not the head). Defendant admitted he killed Devallier, but insisted that Johnson had directed him to do so when he said, "go get the girl." Defendant also admitted shooting Carter as he lay on the ground. Defendant confessed that Johnson had invented the story that Dee Thomas was the killer.

Defendant and Johnson were both charged with murdering Carter and Devallier. The trial court granted Johnson's motion for severance, and he eventually pleaded guilty to attempted premeditated murder and was sentenced to life in prison. At trial, defendant claimed his suppression hearing testimony and his July 30th statements to police were false and that he had made them because he was afraid of Johnson. Between his June 4th and July

30th statements, he claimed he and his family had been threatened by both Johnson and Thomas. He claimed he had to move his mother from the Cole Street home as a result of the threats.

At some point, defendant became uncooperative and refused to answer further questions. After consulting with counsel, defendant stated his June 4th statement was correct, but that he would rather confess to murder and face the death penalty than tell the truth about Thomas and bring his family into harm's way.

## B. *Discussion*

### 1. *The Pretrial Suppression Hearing*

Defendant raises a number of challenges to the admission of the July 30th statements in which he confessed to shooting the victims. He moved before trial to suppress these statements and litigated the issue in a pretrial hearing. The trial court denied the motion, opening the way for the prosecution to introduce the statements at trial.

#### a. *Facts*

The hearing on the motion to suppress was held on January 25, 1993. Sergeant David Kozicki testified that he arranged to speak with defendant about the Carter-Devallier homicides, and defendant came to the police station voluntarily on June 4, 1992. Kozicki testified he read defendant the standard *Miranda* warning from a form provided by the Oakland Police Department. Defendant stated he understood his rights and wished to talk to police, signing the waiver form in Kozicki's presence. Defendant was cooperative and appeared to understand his rights. Defendant waived his rights at 9:38 a.m. and was interviewed until 10:45 a.m., whereupon they took a break until 11:07 a.m. At some point, Kozicki turned on the tape recorder and began recording the interview. Defendant was re-Mirandized and again waived his rights on tape. Defendant admitted he was at the Cole Street house on the night of the murders and claimed he saw Dee Thomas commit the shootings. Sergeant Kozicki denied promising to help defendant if he assisted police in getting evidence against Johnson. The tape of the June 4th interview was played for the trial court.

Sergeant Kozicki obtained search and arrest warrants for defendant on July 28th and asked defendant's grandmother and aunt to have defendant contact him. Defendant contacted Kozicki around 12:30 p.m. on July 30th and made arrangements to return to the police station for another interview.

Police did not wait and took defendant (along with Antoine Johnson and Kenya Lita Cook) into custody around 4:30 p.m. that same day, although they did not inform defendant he was under arrest. The interrogation again took place in a police department interview room, and Sergeant Kozicki again admonished defendant of his *Miranda* rights, which defendant waived, signing the waiver form. Defendant's demeanor "was basically the same, he was cooperative." The interview began around 9:00 p.m., and Kozicki began taping the interview at 9:54 p.m. In this interrogation, defendant admitted his guilt. Kozicki denied telling defendant that he could go home if he gave a statement. He also denied telling defendant police were primarily interested in Johnson. When asked whether defendant "seem[ed] a little slow . . . mentally," Sergeant Kozicki replied in the negative. The tape of this July 30th interview was played for the trial court.

A second tape recording was made immediately after the first July 30th statement in which defendant again admitted his complicity. In this second recording, defendant did not mention Johnson by name. This tape was made for use in case defendant and Johnson were tried together. (See *Bruton v. United States* (1968) 391 U.S. 123, 137 [88 S.Ct. 1620, 1628, 20 L.Ed.2d 476]; *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265].)

Sergeant Brian Thiem, who was also present during parts of the interrogations, testified at the hearing and confirmed that defendant had waived his *Miranda* rights on June 4, 1992, and had no problem understanding those rights. Before the July 30th interview, defendant again waived his *Miranda* rights.

Defendant also testified at the suppression hearing. He stated he was 19 years old at the time of the interrogations and had gone as far as the 10th grade in school. When asked whether he could read and write, he answered, "somewhat." He confirmed that he had gone to the police station on June 4th to speak with Sergeant Kozicki; that he was placed in a windowless interview room; and that although Kozicki was not "nice" to him, he felt free to leave. He was released, but on July 30th police took him (along with Johnson and Cook) into custody and did not immediately tell him he was under arrest. He was handcuffed, but the cuffs were removed shortly after he was placed in the interview room.

According to defendant, about an hour later, Sergeant Kozicki appeared and pressured him to implicate Johnson in the crimes. Defendant testified that when he requested an attorney, Kozicki merely told him that the district attorney wished to speak to him and then left the room. No attorney was

forthcoming. Defendant testified that Kozicki returned later and told him that if he implicated Johnson in the Cole Street murders, he would be free to go. Defendant also testified that Kozicki threatened him, saying that if he did not cooperate, he would be unable to see his mother and grandmother again.

Returning to the question of the *Miranda* waivers, the following colloquy occurred between defense counsel and defendant:

"Q. All right. They gave you a *Miranda* waiver, right?

"A. Yes.

"Q. Did you understand that?

"A. A little.

"Q. What didn't you understand about it?

"A. You know, the—he said I had a right to remain silent, I understand that. [¶] But then when I asked for a lawyer, you know, I asked for one, he said: Well, you really didn't need it.

"Q. He tell you why you didn't need it?

"A. He said because if I told on Antoine [Johnson], he was going to let me go.

"Q. Now, you gave him a statement, is that right?

"A. Yes.

"Q. And you thought if you gave him a statement, you would get to go home?

"A. Yes."

Later, defendant testified that Kozicki promised that if he confessed that Johnson had made him shoot the victims, Kozicki would release him. The prosecutor asked how that was consistent with defendant's admission on the tape that he had killed the victims to prevent them from talking. Defendant replied that Kozicki had told him to say that.

The trial court then interceded:

"THE COURT: You mean everything you said in that second statement . . . about yourself and about . . . Mr. Johnson was told to you ahead of time by Sergeant Kozicki?

"THE WITNESS: Yes.

"THE COURT: How long did it take you to memorize what he wanted you to say?

"THE WITNESS: He was saying—he said it to me—it took an hour. Me and him stayed in the room for about 30 minutes to an hour.

"THE COURT: You memorized it in an hour?

"THE WITNESS: No. Some of the things I made up myself.

"THE COURT: Then he didn't tell you everything to say?

"THE WITNESS: Not everything.

"THE COURT: There's nothing that's . . . actually the truth in. that second statement?

"THE WITNESS: Some things.

"THE COURT: Well, what?

"THE WITNESS: That I did shoot Gary [Carter], but I didn't shoot the girl."

After hearing the testimony and argument from counsel, the trial court denied defendant's suppression motion, explaining: "[The] Court makes the finding that the *Miranda* warnings and waiver were sufficient. He was Mirandized at least three times and more; [¶] That the statements, for the purposes of the hearing, the tape recordings together with the transcriptions will be admitted into evidence . . . . [¶] The Court would find that the statements were all free and voluntary, there is no constitutional violation of rights and that the statements, each of them . . . are admissible. [¶] The Court, in effect, finds that the defendant is not a credible witness as to the statements, based upon his own testimony and the three statements."

b. *Alleged involuntariness*

 Defendant first contends his July 30th statements were involuntary because he was young and immature, had finished only the ninth grade, and was unfamiliar with the legal system. He argues police used deceptive practices to coerce him to confess. We agree with respondent that the record does not support these claims.

■ "The Fourteenth Amendment to the federal Constitution and article I, section 15, of the state Constitution bar the prosecution from using a defendant's involuntary confession. [Citation.] The federal Constitution requires the prosecution to establish, by a preponderance of the evidence, that a defendant's confession was voluntary. [Citation.] The same is now true under California law as a result of an amendment to the state Constitution enacted as part of Proposition 8, a 1982 voter initiative. (See Cal. Const., art. I, § 28, subd. (d); . . . ) . . . [¶] Under both state and federal law, courts apply a 'totality of circumstances' test to determine the voluntariness of a confession. [Citations.] Among the factors to be considered are ' "the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity" as well as "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health." ' [Citation.] On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review. [Citations.] In determining whether a confession was voluntary, '[t]he question is whether defendant's choice to confess was not "essentially free" because his will was overborne.' [Citation.]" (*People v. Massie* (1998) 19 Cal.4th 550, 576 [79 Cal.Rptr.2d 816, 967 P.2d 29].)

■ Although defendant claims police used deceptive practices to coerce him to confess, the only allegedly deceptive practice he identifies is Sergeant Kozicki's failure to inform him immediately upon taking him into custody on July 30 that police had obtained an arrest warrant naming him as a suspect in the Cole Street murders. Defendant does not explain how the voluntariness of his confession required police to disclose they were focusing on him as a suspect. A criminal defendant's *Miranda* waiver is voluntary even if police fail to inform the defendant of all the crimes about which he might be questioned. (*Colorado v. Spring* (1987) 479 U.S. 564 [107 S.Ct. 851, 93 L.Ed.2d 954].) "[A] valid waiver does not require that an individual be informed of all information 'useful' in making his decision or all information that 'might . . . affec[t] his decision to confess.' [Citation.] '[W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.' [Citation.] Here, the additional information could affect only the wisdom of a *Miranda* waiver, not its essentially voluntary and knowing nature." (*Id.* at pp. 576-577 [107 S.Ct. at p. 859], fn. omitted.) As the high court found concerning the *Miranda* waiver in *Colorado v. Spring*, we find Sergeant Kozicki's failure to inform defendant of all the information that might have been useful to him did not render his subsequent statements involuntary.

Defendant also highlights the fact of his youth, his lack of educational achievement, his modest level of literacy, and his unfamiliarity with the legal system as evidence that his confession was involuntary. Although these are factors a court should consider when evaluating the voluntariness of a confession, the record does not even hint that these factors came into play in this case. For example, defendant does not allege he failed to understand the proceedings or Sergeant Kozicki's statements. Moreover, given defendant's prior felony convictions, we cannot conclude he was unfamiliar with the legal system. In addition, both Sergeants Kozicki and Thiem testified defendant understood his rights, and Kozicki testified defendant did not seem mentally slow. There is thus substantial evidence supporting the trial court's decision that, despite defendant's age, educational level and maturity, his July 30th statements were voluntary.

Defendant finally contends his July 30th statements were involuntary because they were induced by improper promises of leniency. A promise to an accused that he will enjoy leniency should he confess obviously implicates the voluntariness of any resulting confession. (*People v. Williams* (1997) 16 Cal.4th 635, 660-661 [66 Cal.Rptr.2d 573, 941 P.2d 752].) Although defendant testified that Sergeant Kozicki told him he would let him go free should he confess and implicate Johnson, the trial court expressly found that defendant was not a credible witness. As the trial court was able to observe defendant testify and listen to the tapes of defendant's statements, we find no reason to doubt the soundness of the trial court's ruling that police made no improper promises of leniency to defendant.

Upon independent review of the totality of the circumstances (*People v. Massie, supra,* 19 Cal.4th at p. 576), we conclude defendant's confession was voluntary.

c. *Alleged Miranda violation*

█ Defendant makes a perfunctory claim that admission of the July 30th statements violated his rights under *Miranda, supra,* 384 U.S. 436. Both Sergeants Kozicki and Thiem affirmed on the record that defendant had been informed of his rights and had waived them. The tape recording also indicated defendant had waived his rights. Although defendant testified he asked for an attorney and was refused, the trial court found he was not a credible witness. "When reviewing a trial court's decision on a motion that a statement was collected in violation of the defendant's rights under *Miranda, supra,* 384 U.S. 436, we defer to the trial court's resolution of disputed facts, including the credibility of witnesses, if that resolution is supported by substantial evidence." (*People v. Weaver* (2001) 26 Cal.4th

876, 918 [111 Cal.Rptr.2d 2, 29 P.3d 103] (*Weaver*).) We find such substantial evidence in the sworn testimony of the officers, in the trial court's ability to observe the demeanor of defendant while testifying, and in the court's ability to listen to defendant waiving his rights on the tape recordings. Accordingly, we reject his claim that his statements were collected in violation of *Miranda*.

### d. *Alleged violation of his constitutional rights*

As noted above, defendant testified at the suppression hearing. During the prosecutor's cross-examination of defendant, defendant admitted he had lied in the June 4th statement when he claimed he saw Dee Thomas and a friend commit the crimes. Defendant also claimed he lied in the first July 30th statement when he stated that he was himself principally responsible, and had lied in the second July 30th statement when he made essentially the same statement. Instead, he testified he took responsibility for the shootings because Sergeant Kozicki told him he would be free to leave if he admitted guilt and implicated Johnson. Defense counsel objected several times, arguing the prosecutor's questions went to the content of defendant's statements and not their voluntariness. The trial court overruled the objections, ruling the questions were relevant to defendant's credibility.

Defendant now contends the prosecutor's questions were improper because they went beyond the scope of his direct testimony, elicited irrelevant information by delving into the content of his statements and not their voluntariness, and violated his right to be free of compelled self-incrimination under the Fifth and Fourteenth Amendments to the United States Constitution. At the threshold, the People contend defendant failed to object on these grounds and thus did not preserve them for appellate review.[2] We disagree: Defense counsel made several objections that were cut off by the trial court before counsel could articulate fully the grounds of his objection. Counsel spoke of a concern that the prosecutor was questioning about the content of defendant's July 30th statements rather than their voluntariness, a clear reference to the scope of cross-examination and the relevance of the evidence elicited. In addition, counsel twice mentioned a concern that the prosecutor was attempting to get defendant to make admissions, from which we may discern that the basis of counsel's objection was defendant's right against compelled self-incrimination. These objections

---

[2]The People contend defendant "acknowledges . . . he failed to preserve the issue," but defendant merely argues we should find his defense counsel were constitutionally ineffective "[t]o the extent that counsel failed to properly or fully articulate an objection [on these grounds]." (Italics added.) We find defendant does not concede that he forfeited the issue for appeal.

were to questions concerning the June 4th statement, but counsel made a continuing objection as questioning turned to the two July 30th statements. Although the record is not crystal clear, we conclude these matters were adequately preserved for appeal.

 Turning to the merits, we agree with the trial court that defendant's credibility was at issue in the suppression hearing and he properly could be impeached with information that he had lied in all three of his recorded statements. Contrary to defendant's contention, whether or not his July 30th statements were coerced was not the "sole issue at the suppression hearing." In addition to the question of voluntariness, the trial court was required to rule on whether defendant was afforded his rights under *Miranda, supra,* 384 U.S. 436. Because defendant claimed Sergeant Kozicki had ignored him when he invoked his right to an attorney, whereas both Kozicki and Sergeant Thiem testified defendant had voluntarily waived his rights, defendant's credibility was implicated directly. "The credibility of a witness may be challenged with evidence of prior statements by the witness that are inconsistent with the witness's testimony at the trial." (*People v. Price* (1991) 1 Cal.4th 324, 474 [3 Cal.Rptr.2d 106, 821 P.2d 610]; see also Evid. Code, § 780, subds. (h) & (k).)[3]

Citing *Chambers v. Mississippi* (1973) 410 U.S. 284 [93 S.Ct. 1038, 35 L.Ed.2d 297], defendant contends that although the prosecutor's questions may have been proper under the Evidence Code, strict application of state evidentiary rules may, under the circumstances, nevertheless violate his constitutional rights. Although defendant is correct in the abstract that a state evidentiary rule may still be unconstitutional, " '[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense.' " (*People v. Jones* (1998) 17 Cal.4th 279, 305 [70 Cal.Rptr.2d 793, 949 P.2d 890], quoting *People v. Hall* (1986) 41 Cal.3d 826, 834 [226 Cal.Rptr. 112, 718 P.2d 99]; see also *People v. Fudge* (1994) 7 Cal.4th 1075, 1122 [31 Cal.Rptr.2d 321, 875 P.2d 36], and cases cited.) Defendant fails to explain why the relatively routine practice of permitting an adverse party to impeach the credibility of a witness with prior falsehoods in the same case somehow falls so far from a standard of fundamental fairness that we may conclude it violates defendant's constitutional rights.

Although defendant's credibility was at issue, the People were not entitled to impeach him by violating his constitutional privilege against compelled

---

[3]Evidence Code section 780 provides in part: "[T]he court . . . may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to any of the following: [¶] . . . [¶]

"(h) A statement made by him that is inconsistent with any part of his testimony at the hearing. [¶] . . . [¶]

"(k) His admission of untruthfulness."

self-incrimination. Defendant contends that by allowing the prosecutor to continue her cross-examination into the substance and truthfulness of his July 30th statements, he was compelled to admit his guilt in violation of his rights under the Fifth Amendment.[4] We disagree. Defendant's statements—even if they constituted admissions of guilt—were admissible in the suppression hearing only, and not to prove his guilt in the People's case-in-chief at trial. (*Simmons v. United States* (1968) 390 U.S. 377, 393-394 [88 S.Ct. 967, 975-977, 19 L.Ed.2d 1247].) This limited immunity[5] protects an accused's rights under the Fifth Amendment and, in light of this immunity, we conclude defendant's Fifth Amendment rights were not violated at the hearing.

To the extent defendant also claims the prosecutor's questioning constituted misconduct and violated his constitutional rights to due process, a fair trial, and his rights under the Eighth Amendment to the United States Constitution, we find no objection on those grounds and conclude they were not preserved for appeal. (*People v. Mickle* (1991) 54 Cal.3d 140, 191 [284 Cal.Rptr. 511, 814 P.2d 290].) The record does not indicate counsel's strategy in failing to object on these grounds; most likely counsel believed defendant's constitutional rights were protected by the use immunity set forth in *Simmons v. United States, supra,* 390 U.S. at pages 393-394 [88 S.Ct. at pp. 975-977]. In any event, because this is not a situation in which counsel could have had no reasonable purpose for failing to object, we must reject defendant's further claim that his defense counsel were constitutionally ineffective for failing to object. Such claims must instead be raised in a collateral proceeding. (*People v. Kraft* (2000) 23 Cal.4th 978, 1068-1069 [99 Cal.Rptr.2d 1, 5 P.3d 68]; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-268 [62 Cal.Rptr.2d 437, 933 P.2d 1134].)

### 2. *Challenge for Cause*

Defendant challenged Prospective Juror K.C. for cause, claiming he was biased in favor of the death penalty, but the trial court denied the challenge. Defendant claims the trial court's ruling was error and denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as state constitutional analogs. As we

---

[4]The Fifth Amendment to the United States Constitution provides in part: "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." This privilege is incorporated into the Fourteenth Amendment and thus made applicable to the states. (*Malloy v. Hogan* (1964) 378 U.S. 1, 8 [84 S.Ct. 1489, 1493-1494, 12 L.Ed.2d 653]; *Segretti v. State Bar* (1976) 15 Cal.3d 878, 886 [126 Cal.Rptr. 793, 544 P.2d 929].)

[5]The statements were admissible to impeach him if his trial testimony proved inconsistent with his testimony at the suppression hearing. (*People v. Drews* (1989) 208 Cal.App.3d 1317, 1325 [256 Cal.Rptr. 846].)

explain, the trial court erred by not excusing this juror, but the court's error did not compromise the impartiality of the jury so no relief is warranted.

At the outset, the People contend defendant failed to preserve the claim for appeal because, although he made a timely challenge for cause, exercised a peremptory challenge to excuse the objectionable juror, and then exhausted his peremptory challenges, he did not then express dissatisfaction at the composition of the jury as eventually selected. (See *Weaver, supra,* 26 Cal.4th at pp. 910-911.) As in *Weaver,* we will not rely on this omission, for the law was in a state of flux on this point at the time of defendant's 1993 trial. (Compare *People v. Crittenden* (1994) 9 Cal.4th 83, 121 [36 Cal.Rptr.2d 474, 885 P.2d 887] [statement of dissatisfaction with the jury required] with *People v. Bittaker* (1989) 48 Cal.3d 1046, 1087-1088 [259 Cal.Rptr. 630, 774 P.2d 659] [suggesting relief could still be granted if a defendant could show denial of an impartial jury].)

■ We recently stated the law with regard to challenges for cause: "The state and federal constitutional guarantees of a trial by an impartial jury include the right in a capital case to a jury whose members will not automatically impose the death penalty for all murders, but will instead consider and weigh the mitigating evidence in determining the appropriate sentence. [Citation.] '[A] juror may be challenged for cause based upon his or her views concerning capital punishment only if those views would "prevent or substantially impair" the performance of the juror's duties as defined by the court's instructions and the juror's oath.' [Citations.] If the death penalty is imposed by a jury containing even one juror who would vote automatically for the death penalty without considering the mitigating evidence, 'the State is disentitled to execute the sentence.' [Citation.]

"Assessing the qualifications of jurors challenged for cause is a matter falling within the broad discretion of the trial court. [Citation.] The trial court must determine whether the prospective juror will be 'unable to faithfully and impartially apply the law in the case.' [Citation.] A juror will often give conflicting or confusing answers regarding his or her impartiality or capacity to serve, and the trial court must weigh the juror's responses in deciding whether to remove the juror for cause. The trial court's resolution of these factual matters is binding on the appellate court if supported by substantial evidence. [Citation.] '[W]here equivocal or conflicting responses are elicited regarding a prospective juror's ability to impose the death penalty, the trial court's determination as to his true state of mind is binding on an appellate court. [Citations.]' [Citation.]" (*Weaver, supra,* 26 Cal.4th at p. 910, quoting *Wainwright v. Witt* (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841] and *Morgan v. Illinois* (1992) 504 U.S. 719, 729 [112 S.Ct. 2222, 2229-2230, 119 L.Ed.2d 492].)

▮ Prospective Juror K.C. indicated on his juror questionnaire that he was "strongly in favor" of the death penalty. He also indicated that the death penalty should automatically be imposed on those defendants convicted of committing a multiple murder. When asked by the trial court whether he was "strongly in favor of the death penalty," he answered in the affirmative. When the court asked whether he could return "a verdict of life imprisonment without [the] possibility of parole if you thought it appropriate," he replied, "I would probably have to be convinced." He did not similarly qualify his answer when asked whether he could impose the death penalty. He explained he believed the death penalty was "effective" and that, given an "honest choice" between the two penalties, he "would be more inclined to go with the death penalty." He equivocated when asked whether he would exclude consideration of a life term, saying, "Never having been in that situation, I have no idea." When asked whether he could impose a life term if he thought it appropriate, he replied: "Yeah, if there was enough to make it seem appropriate, yes, I could."

Defense counsel then undertook voir dire. The juror affirmed he was "somewhat pro death," and when asked whether both penalties were "open" to him in a situation where aggravating factors greatly outweighed mitigating ones, he replied: "I would vote probably for the death penalty. Life imprisonment without possibility of parole only lasts as long as the political climate makes it a good idea." The following exchange then occurred:

"THE COURT: You understand life imprisonment without possibility of parole means that?

"PROSPECTIVE JUROR [K.C.]: Unless the sentence is commuted by the Governor.

"THE COURT: You may be aware of some cases.

"PROSPECTIVE JUROR [K.C.]: Yes, I am.

"THE COURT: Such as Sirhan Sirhan and the Manson [case] in which he comes up for parole.

"PROSPECTIVE JUROR [K.C.]: No, that's not—

"THE COURT: They were convicted at a time when the statute didn't provide for life imprisonment without possibility of parole.

"PROSPECTIVE JUROR [K.C.]: I'm referring to—

"THE COURT: Can you assume that life imprisonment without possibility of parole means what it says?

"PROSPECTIVE JUROR [K.C.]: Well, from my experience in other states where it was imposed, no, it didn't.

"THE COURT: In California, *can you assume that?*

"PROSPECTIVE JUROR [K.C.]: *Given some of the political leaders in this state, no, I can't.*" (Italics added.)

In addition to the question of the death penalty, the juror explained he had been the victim of an attempted murder, but asserted that experience would not bias him against defendant because it had happened so long ago. He also testified he had a son with a legal problem and that his son's situation would affect his attention span for defendant's case. Defense counsel then challenged the juror for cause, but the trial court denied it, explaining: "I think he's qualified under *Wainwright* [*v. Witt, supra,* 469 U.S. 412]." Defendant later used one of his peremptory challenges to remove Prospective Juror K.C. from the jury.

Although we pay great deference to the decisions of our trial courts in their determinations of whether a prospective juror can remain impartial, we conclude the trial court should have sustained defendant's challenge for cause against this juror. This was not a case in which the juror gave equivocal answers: He was strongly in favor of the death penalty and was not shy about expressing that view. He indicated he would apply a higher standard ("I would probably have to be convinced") to a life sentence than to one of death, and that an offender (such as defendant) who killed more than one victim should automatically receive the death penalty. Finally, he admitted he would not follow an instruction to assume that a sentence of life in prison with no possibility of parole meant the prisoner would never be released. Because this juror's views would have " 'prevent[ed] or substantially impair[ed] the performance of his duties as a juror in accordance with his instructions and his oath' " (*Wainwright v. Witt, supra,* 469 U.S. at p. 424), the trial court erred in denying defendant's challenge for cause.

Because defendant removed Prospective Juror K.C. from the jury using a peremptory challenge, however, the juror never served on the jury and the impartiality of defendant's jury was not undermined by the trial court's error. Defendant's argument is thus reduced to a claim that the trial court's error forced him to use one of his peremptory challenges, thereby reducing the number he had on hand later in the trial.

Relief is not warranted on this theory. "It is well settled that even if the trial court erred in denying a defendant's motion to remove a juror for cause, that error will be considered harmless if '[n]one of the prospective jurors whom defendant found objectionable actually sat on his jury.' [Citations.] '[W]e reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury.' [Citation.]" (*People v. Hawkins* (1995) 10 Cal.4th 920, 939 [42 Cal.Rptr.2d 636, 897 P.2d 574], overruled on another point in *People v. Blakeley* (2000) 23 Cal.4th 82, 89-91 [96 Cal.Rptr.2d 451, 999 P.2d 675].) Furthermore, defendant did not express dissatisfaction with the jury as constituted and, although we decline to find he forfeited the issue as a result, that omission is relevant to determining whether he was prejudiced by the trial court's error. To the extent defendant now suggests he was unhappy with the composition of the jury, his "belated recitation of dissatisfaction with the jury is speculative. Consequently, he fails to demonstrate that he was harmed by the denial of his challenges for cause." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1211 [14 Cal.Rptr.2d 702, 842 P.2d 1].)

In short, we conclude the trial court's erroneous denial of defendant's challenge for cause did not violate his constitutional right to an impartial jury.[6]

### 3. *Alleged Wheeler Error*

Defendant next claims the prosecutor excused three African-American women from the jury in violation of his rights under *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*). " 'In [*Wheeler*] . . . we held that the use of peremptory challenges by a prosecutor to strike prospective jurors on the basis of group membership violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution. Subsequently, in *Batson* v. *Kentucky* (1986) 476

---

[6]Defendant additionally claims the trial court's "failure to adhere to a consistent standard for the qualification of jurors" arbitrarily deprived him of a right created by state law in violation of his right to federal due process. (*Hicks v. Oklahoma* (1980) 447 U.S. 343 [100 S.Ct. 2227, 65 L.Ed.2d 175].) We disagree. In *Hicks*, the United States Supreme Court explained that a state law guaranteeing a criminal defendant certain procedural rights at a sentencing hearing, even if not constitutionally required, may give rise to a liberty interest protected against arbitrary deprivation by the due process clause. (*Id.* at p. 346 [100 S.Ct. at pp. 2229-2230].) Defendant does not explain how the necessity of having our trial courts determine a juror's credibility and willingness to abide by the law is the equivalent of a guarantee of a procedural right based in state law. (See *Weaver, supra*, 26 Cal.4th at pp. 986-987 [rejecting a claim based on *Hicks* due to the defendant's failure to present legal argument].) A contrary holding would convert all incorrect rulings by our trial courts into constitutional error. We thus reject his reading of *Hicks*.

U.S. 79, 84-89 [90 L.Ed.2d 69, 79-83, 106 S.Ct. 1712] . . . the United States Supreme Court held that such a practice violates, inter alia, the defendant's right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution. . . .'" (*People v. Catlin* (2001) 26 Cal.4th 81, 116 [109 Cal.Rptr.2d 31, 26 P.3d 357].)

### a. *Facts*

Defendant focuses on three prospective jurors.

<u>Prospective Juror V.F.</u> In her jury questionnaire, V.F. stated she was "neutral" about the death penalty, would vote in favor of an initiative creating a death penalty in California, and if she found herself on the jury would not automatically vote for or against it. She wrote that the purpose of the death penalty was "[t]o remove that person from the earth so that he/she cannot commit any other crimes and to make the statement to all—Commit a Crime you must be punished to some degree." In response to the question "Overall, in considering general issues of punishment, which do you think is <u>worse for a defendant?</u>," she circled "Life in prison without possibility of parole." She explained: "Because it gives him/her longer to think about the crime and to ask[] themselves whether it was worth it or was there another answer." In response to the question "Do you feel that the death sentence is imposed:" she circled "About right."

During voir dire, she testified she was a Christian but that voting for the death penalty would not get her in trouble at her church. She admitted to some confusion over whether life meant with or without parole, but affirmed her belief that life in prison was "worse" because the prisoner would know he was in prison "forever" and that "you could be tortured that way where you can't get out into society." She affirmed she could vote for the death penalty.

<u>Prospective Juror B.W.</u> In her jury questionnaire, B.W. stated she was "moderately in favor" of the death penalty, would vote in favor of an initiative creating a death penalty in California, and if she found herself on the jury would not automatically vote for or against it. She wrote that the purpose of the death penalty was so "that person will never commit that crime again." In response to the question "Overall, in considering general issues of punishment, which do you think is <u>worse for a defendant?</u>," she circled "Death." She explained: "They will never exist again. They will leave family and friends." In response to the question "Do you feel that the *death sentence is imposed:*" she circled "Randomly" and explained: "Look at death row. People have been waiting for years. You shouldn't have death

row if death never comes." During voir dire, she testified she could vote for the death penalty if selected for the jury.

Prospective Juror L.D. In her jury questionnaire, L.D. stated she was "moderately in favor" of the death penalty, would vote in favor of an initiative creating a death penalty in California, and if she found herself on the jury would not automatically vote for or against it. Responding to a question asking what she thought was the purpose of the death penalty, she wrote: "I think it deters other criminals from committing serious crimes." In response to the question "Overall, in considering general issues of punishment, which do you think is worse for a defendant?," she circled "Life in prison without possibility of parole." She explained: "Because I believe life in prison is a constant suffering." In response to the question "Do you feel that the death sentence is imposed:" she circled "About right" and explained: "I think it is about right because of all the things that have to be taken into consideration. When dealing with a life you must be sure." During voir dire, this juror reiterated she had a brother who was a police officer, that she was "moderately in favor" of the death penalty, and that she was capable of returning a death penalty verdict.

After the prosecutor had exercised 15 of her peremptory challenges, defendant objected on *Wheeler* grounds. The motion was reserved until both sides had exhausted their peremptory challenges and a jury was selected. The court then entertained the motion. Defense counsel claimed the prosecutor had struck four of the six African-American women from the panel. Specifically, the prosecutor had removed Prospective Jurors V.F., B.W., L.D. and G.A.[7] The trial court noted that the panel still contained two African-American women and stated: "I don't think a prima facie case has been shown. . . . I don't know if the district attorney wants to explain her challenges or not." The prosecutor explained that she did not have the juror questionnaires with her, but that her recollection was that the four African-American women she challenged were what she called "lifers," that is, they could not vote for the death penalty. The prosecutor also noted some African-Americans remained on the jury.

The trial court then denied the motion, stating: "As I say, I don't think a prima facie case has been shown. [¶] I would have to agree with the district attorney on her challenges of the four Black African-American women, that I did not believe they were persons who would vote for the penalty of death based upon their questionnaires and their answers [during voir dire]."

b. *Discussion*

We presume that "a prosecutor uses his peremptory challenges in a constitutional manner. [Citation.] The defendant bears the burden to show,

---

[7]Defendant concedes Prospective Juror G.A. was reluctant to impose the death penalty.

prima facie, the presence of purposeful discrimination. [Citation.] If he succeeds, the burden shifts to the prosecutor to show its absence." (*People v. Alvarez* (1996) 14 Cal.4th 155, 193 [58 Cal.Rptr.2d 385, 926 P.2d 365].) In order to establish a prima facie case of group bias, a litigant must raise the issue in a timely fashion, make as complete a record as feasible, establish that the persons excluded are members of a cognizable class, and show a " 'strong likelihood' " of group rather than individual bias. (*People v. Howard* (1992) 1 Cal.4th 1132, 1153-1154 [5 Cal.Rptr.2d 268, 824 P.2d 1315], italics omitted; *Wheeler, supra,* 22 Cal.3d at p. 280.) "We give great deference to the trial court in distinguishing bona fide reasons from sham excuses." (*People v. Turner* (1994) 8 Cal.4th 137, 165 [32 Cal.Rptr.2d 762, 878 P.2d 521]; *Wheeler, supra,* at p. 282.)

▉ The dispositive question here is whether defendant demonstrated a prima facie case of group bias. Neither party disputes that the issue was timely raised or that the record is adequate for review. Moreover, that African-American women comprise a cognizable class for *Wheeler* purposes is clear. (*People v. Clair* (1992) 2 Cal.4th 629, 652 [7 Cal.Rptr.2d 564, 828 P.2d 705].) We turn, then, to whether defendant established a "strong likelihood" of group bias. Although the three jurors in question were all African-American women, defense counsel did not provide any other reason why he believed group bias motivated the prosecutor. Although the trial court did not immediately rule on whether a prima facie showing had been made, it nevertheless asked the prosecutor for her reasons. As in other cases, we hold this did not moot the question of whether defendant had established a prima facie showing. (*People v. Welch* (1999) 20 Cal.4th 701, 746 [85 Cal.Rptr.2d 203, 976 P.2d 754]; *People v. Turner, supra,* 8 Cal.4th at p. 166.)

The prosecutor indicated she was concerned about the jurors' willingness to impose the death penalty. All three jurors had professed they were open to voting to impose the death penalty, although none was a strong supporter of that penalty. Prospective Juror V.F. had indicated she was neutral about the death penalty. Both V.F. and Prospective Juror L.D. suggested they believed life in prison was a harsher penalty. Prospective Juror B.W. expressed some impatience with the death penalty, noting the length of time some inmates spend on death row. The trial court was clearly aware of the answers these jurors had provided on the questionnaires and observed their demeanor as they testified, two factors undermining defendant's claim that the court accepted the prosecutor's reasons without reviewing the record.

Defendant further claims it was not true the three jurors would refuse to vote for the death penalty, but neither the prosecutor nor the trial court was required to take the jurors' answers at face value. Although defendant

contends that other jurors who were equally unenthusiastic about the death penalty were not challenged, and that the African-Americans left on the jury were much more pro-death-penalty, we do not engage in a comparative analysis when evaluating a prosecutor's stated reasons. (*People v. Fuentes* (1991) 54 Cal.3d 707, 714-715 [286 Cal.Rptr. 792, 818 P.2d 75].)

Defendant also contends the trial court used the wrong standard in assessing whether he had established a prima facie showing of group bias. He claims he need only "raise an inference" of such bias, whereas we have held he must "show a strong likelihood" of such bias. (See *Wade v. Terhune* (9th Cir. 2000) 202 F.3d 1190 [discussing a perceived difference between the two standards].) However, as we have explained, "in California, a 'strong likelihood' means 'a reasonable inference.'" (*People v. Box* (2000) 23 Cal.4th 1153, 1188, fn. 7 [99 Cal.Rptr.2d 69, 5 P.3d 130]; see *Wheeler, supra*, 22 Cal.3d at pp. 280-281.) Moreover, even assuming arguendo that the two standards were different, and that the "reasonable inference" standard were more lenient, the court's ruling finding that defendant had not established a prima facie showing of group bias was supportable.

Because the trial court's ruling that defendant failed to make a prima facie showing of group bias is supported by substantial evidence and is thus entitled to deference, we deny defendant's *Wheeler* claim.

### 4. *Admission of Evidence Regarding the Victims*

Defendant next claims the trial court erred by admitting into evidence photographs of the victims while they were alive and testimony from surviving relatives identifying them from those pictures. He argues this evidence "prevented an impartial assessment of guilt, distracted the jury from its responsibility to decide the appropriate penalty, and violated [his] rights under state law and federal constitutional law."

The prosecutor asked Alvarez Devallier, Annette's father, to identify her from a photograph taken while she was alive. He did so and also testified she had been living at a rehabilitation program on Hilton Street until a week before she was killed. The People also had Reo Carter, Gary's sister, identify him from a photograph taken while he was alive. She did so and testified the victim had been living with her at the time he was killed. Defendant did not object to this testimony or to the use of the photographs. When the prosecutor later moved to admit both photographs into evidence, however, defendant objected, explaining that he would stipulate to the identity of the victims. The trial court overruled the objection, explaining that the "probative value [of the evidence] outweighs any prejudicial effect."

Because defendant did not object at the time the photographs were used in questioning the witnesses, he failed to preserve the issue for appeal. Although he later raised an objection, that objection was not sufficiently timely

to preserve the issue. The requirement that an objection to evidence be timely made is important because it "allows the court to remedy the situation before any prejudice accrues." (*People v. Taylor* (1982) 31 Cal.3d 488, 496 [183 Cal.Rptr. 64, 645 P.2d 115].)

 Defendant contends that, if we find the issue was not preserved for appeal, we should find that his counsel were constitutionally ineffective for failing to object. Failure to object rarely constitutes constitutionally ineffective legal representation (*People v. Avena* (1996) 13 Cal.4th 394, 421 [53 Cal.Rptr.2d 301, 916 P.2d 1000]), but assuming the matter was preserved, we would still find no error. Although only relevant evidence is admissible (Evid. Code, § 350), "[t]he state is not required to prove its case shorn of photographic evidence merely because the defendant agrees with a witness or stipulates to a fact." (*Weaver, supra,* 26 Cal.4th at p. 933.) Trial courts have wide discretion in admitting such photographic evidence, and we have explained that "trial courts should be alert to how photographs may play on a jury's emotions, especially in a capital case, [and] we rely on our trial courts to exercise their discretion wisely, both to allow the state fairly to present its case as well as to ensure that an accused is provided with a fair trial by an impartial jury." (*Id.* at p. 934.) We have examined the challenged photographs and conclude the trial court did not abuse its broad discretion. Photographic evidence of murder victims while they were alive is not necessarily inadmissible. (*People v. Smithey* (1999) 20 Cal.4th 936, 975 [86 Cal.Rptr.2d 243, 978 P.2d 1171].) Even were we to reach a different conclusion, any error was manifestly harmless in light of the strong evidence of guilt, including defendant's confession. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

 To the extent defendant argues that admission of the photographic evidence violated his federal constitutional rights to due process, a fair trial, a reliable penalty determination, freedom from cruel and unusual punishment, and his right to due process under *Hicks v. Oklahoma, supra,* 447 U.S. 343, we find those issues were not preserved for appeal because defendant did not object at trial on those specific grounds. (*People v. Crittenden, supra,* 9 Cal.4th at p. 126; *People v. Rogers* (1978) 21 Cal.3d 542, 547-548 [146 Cal.Rptr. 732, 579 P.2d 1048].) "Specificity is required both to enable the court to make an informed ruling on the motion or objection and to enable the party proffering the evidence to cure the defect in the evidence." (*People v. Mattson* (1990) 50 Cal.3d 826, 854 [268 Cal.Rptr. 802, 789 P.2d 983].)

 With regard to the testimony of Alvarez Devallier and Reo Carter, defendant did not object at all. Accordingly, he failed to preserve his objections to their testimony. Even were we to reach the issue, both witnesses refuted an aspect of the defense's case, namely, defendant's claim

that the victims were living at the Cole Street house at the time they were killed. The testimony of these witnesses was thus relevant and admissible. Moreover, defendant is incorrect that their testimony was inflammatory; it was, instead, brief and factual. We find no error.

### 5. *Restriction on Defense Evidence*

Defendant next claims the trial court erred in excluding portions of the testimony of Earl Turner, Latonya Jackson and Marcia Surrell on either hearsay or relevance grounds. As we explain, the trial court made a small error, but the error was harmless.

#### a. *Facts*

Defendant gave varying stories about his involvement in the crimes. His first recorded statement to police on June 4, 1992, blamed Ronald "Dee" Thomas for the shootings. On July 30, 1992, he gave two additional recorded statements, confessing to shooting both Devallier and Carter, though insisting Antoine Johnson had directed him to kill Devallier. This was contrary to his June 4th statement, in which he had blamed Thomas for the killings. On January 25, 1993, at the suppression hearing, defendant told yet a different story, claiming that nearly everything in the two July 30th statements was a lie, and that he had simply parroted a memorized version of the crime given to him by Sergeant Kozicki.

At trial, defendant took the stand and suggested his original story on June 4th blaming Thomas was the accurate one. He was very evasive, refusing to answer several questions, claiming that both he and his mother had received threats. Warned that his entire testimony could be stricken, he nevertheless refused to answer some questions. He eventually testified that after giving the June 4th statement, word of his statement got out on the street and Dee Thomas threatened his life. Defendant explained that, with the help of a woman named Tanya, he had moved his mother from the Cole Street house to a safer location, although he later admitted his mother had to move because the house was boarded up. Defendant also testified that Johnson had threatened him and let it be known in jail that defendant was a snitch. When asked what happens to snitches in jail, defendant replied: "They die." He admitted he was worried that his testimony would be reported to Johnson because Johnson's attorney was in the courtroom.

Defendant testified he had lied at the suppression hearing and disavowed his prior claim that Sergeant Kozicki had told him what to say. He claimed he lied because Johnson was present at the hearing and he was afraid for his

life. He also testified his statements on July 30th were all lies. When asked whether his June 4th statement (blaming Dee Thomas) was the truth, he replied in the affirmative. When asked whether "everything" he had said on June 4th was true, he turned evasive, saying, "I can't really say." The following colloquy then occurred:

"Q. Okay. You mentioned that the exchange that took place between Dee and his friend went down as: Let me see the gun, give me the gun.

"Is that the truth or a lie?

"A. I'm not going to answer that due to the fact that I might be a dead man if I answer.

"Q. A dead man from whom?

"A. In jail or on the streets, wherever. [¶] . . . [¶]

"Q. . . . You say your life is in danger because you confessed to two murders and you basically said Antoine [Johnson] just did the shooting in the house and you did all the killing out in the streets.

"A. No, that's not the reason why my life [is] in danger. The reason why my life is in danger is because of the first statement.

"Q. Because of the first statement?

"A. Yes, it is.

"Q. When you blamed Dee and his friend?

"A. Yes."

Later, the defense called Earl Turner to the stand. Turner testified he had grown up with, and was a close friend to, Johnson. He also had known Dee Thomas for about two years. While Defense Counsel Cannady was questioning Turner, the following exchange occurred:

"Q. . . . Did [Dee] ever threaten you?

"A. Yes, we have gotten into arguments before.

"Q. And what was that argument over?

"MS. DRABEC [the prosecutor]: Objection, irrelevant.

"THE COURT: Sustained.

"MR. CANNADY: May we approach, your Honor?

"THE COURT: Mr. Dee is not on trial here, sir.

"MR. CANNADY: I understand that, your Honor.

"THE COURT: No need to approach. Ask him a relevant question and he may answer."

Later, defendant called Latonya Jackson to the stand, presumably to corroborate his claim that he had asked her to help his mother, Marcia Surrell, move from the Cole Street house due to threats of violence. Jackson testified she had helped Surrell move to her home after the crimes, but when she was asked whether Surrell "indicate[d] . . . anything about being concerned for her safety," the trial court sustained the prosecutor's hearsay objection.

The defense rested shortly thereafter. That afternoon, the defense moved to reopen, explaining they had found defendant's mother, Marcia Surrell, and wished to call her to corroborate defendant's claim that she had been threatened and had moved from the Cole Street house as a result of those threats. The trial court questioned the relevance of such testimony and the parties discussed the matter. Eventually, the trial court ruled the defense could reopen its case and that Surrell could testify, not as to specific threats, but that she was afraid of Johnson.

Surrell then testified and affirmed she was defendant's mother and that she had lived at the Cole Street house. She knew Johnson and had seen him with a gun. Asked whether a man named "Dee" visited the house, she replied: "There was a couple of Dee's. There was two people that was—that called their self Dee that came over there." Defense counsel never asked her if she was afraid of Johnson.

b. *Discussion*

██ Defendant claims his constitutional rights to due process, to present a defense, to confront the evidence against him, and to a reliable and nonarbitrary determination of guilt were violated by the trial court's evidentiary rulings. (U.S. Const., 5th, 6th, 8th & 14th Amends.) His attempt to inflate garden-variety evidentiary questions into constitutional ones is unpersuasive. ██ "As a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's

right to present a defense.' [Citations.] Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense. [Citation.] If the trial court misstepped, '[t]he trial court's ruling was an error of law merely; there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense.' [Citation.] Accordingly, the proper standard of review is that announced in *People* v. *Watson*[, *supra*,] 46 Cal.2d 818, 836 . . . , and not the stricter beyond-a-reasonable-doubt standard reserved for errors of constitutional dimension (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065])." (*People v. Fudge, supra,* 7 Cal.4th at pp. 1102-1103.)

 The exclusion of Earl Turner's testimony concerning the subject of his arguments with, and possible threats by, Dee Thomas was proper. " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210; see also *id.*, § 350 ["No evidence is admissible except relevant evidence"].) Whether or not Thomas had ever threatened Turner had no tendency to prove whether or not Thomas had threatened defendant. Accordingly, the trial court correctly sustained the prosecutor's relevancy objection.

 Whether Latonya Jackson had heard defendant's mother express a concern for her safety requires a different analysis. " 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) The evidence defendant sought to elicit from Jackson arguably was offered for its truth, i.e., that Surrell was in fact concerned for her safety. This would lead to the inference that Johnson (or Dee Thomas) actually had threatened Surrell, thereby tending to support defendant's assertion at trial that he and his family were threatened, thus explaining why he changed his story. Because defendant's questioning of Jackson sought evidence of a statement made by Surrell that was offered for its truth, the trial court properly sustained a hearsay objection. Even assuming for argument that the court erred, no prejudice resulted. Defendant was, of course, free to ask Surrell herself whether she was concerned for her own safety. He did not do so. Moreover, he admitted on cross-examination that his mother had moved from the Cole Street house because it had been boarded up, not (as he had claimed) because of threats. We thus find no error and no prejudice.

 Finally, defendant contends the trial court improperly limited his questioning of Marcia Surrell, prohibiting questioning about specific threats.

We agree. Evidence of specific threats would have corroborated defendant's testimony that he and his family had been threatened, thus persuading him to change his story from blaming Dee Thomas for the shootings to accepting blame himself for fear of retaliation from Johnson. Moreover, evidence of threats would not have been barred by the hearsay rule, for such evidence would not have been offered for its truth (i.e., that Thomas or Johnson actually intended to retaliate against defendant or his family), but for a different purpose: to show the effect of the statements on defendant. (See, e.g., *People v. Jackson* (1991) 235 Cal.App.3d 1670, 1680-1681 [1 Cal.Rptr.2d 778] [evidence of threat admitted for the nonhearsay purpose of showing consciousness of guilt].) The trial court thus erred in ruling this evidence was not relevant.

Although the trial court erred, the error was harmless. Defendant was allowed by the trial court to ask Surrell whether she was afraid of Johnson, but he did not do so. Moreover, his many changes of story were inherently incredible and the evidence of his guilt overwhelming, from Guillory's eyewitness testimony identifying defendant, to David Brooks's testimony that he saw someone of defendant's build standing over one of the victims, to the forensic evidence matching the scenario provided by defendant's July 30th statements. We thus conclude "it is [not] reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error." (*People v. Watson, supra,* 46 Cal.2d at p. 836.)

### 6. *Failure to Answer Juror's Question*

During the presentation of the defense case, the trial court received a note from a juror.[8] The juror asked four questions: "How can a homeless person obtain such private lawyer[s] or are the [defense attorneys] court appointed? [¶] [Regarding] the neighbor who lived 4 houses up the street[,] describe the size of the person he saw standing in the street or over (near) the body (sml, med, lrg) short or tall. [¶] [Is t]his blind person being tried also or what[?] [¶] Did the person on trial [take,] or is he willing to take[,] a lie detector test[?]"

Out of the presence of the jury, the parties discussed the note. As to the question about defendant's alleged homelessness, the trial court proposed not to answer the question, explaining: "That's really none of his business, so we're not going to comment on that." As to the second question regarding David Brooks, the neighbor, and his description of the perpetrator, the parties could not agree on a stipulation and the prosecutor eventually

---

[8]Although defendant contends the note was from the jury, it appears the note was sent by a single juror.

resolved the matter by calling Brooks to the stand on rebuttal. Brooks then testified the figure he saw from a distance standing over the body was smaller than a 300-pound neighbor and "fits into [the] category" of defendant's physique. As to the third question, the trial court informed the parties that the jury had been and would again be instructed that Johnson would be tried separately and that it should not concern itself with that subject. Finally, as to the fourth question, the trial court simply stated that the question of lie detectors was none of the jury's business.

Defendant contends the trial court's failure to answer any of the juror's questions violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution by depriving him of his rights "to due process, to a fair trial by an impartial jury, to a jury trial, to confront the witnesses against him, and to a reliable determination of guilt beyond a reasonable doubt and a reliable, individualized, and non-arbitrary and capricious sentencing determination." When the trial court proposed its decision not to respond to the juror's note, however, defendant did not object. He thus failed to preserve the issue for appeal and, indeed, may be held to have given tacit approval of the trial court's decision. (Cf. *People v. Kageler* (1973) 32 Cal.App.3d 738, 746 [108 Cal.Rptr. 235] [failure to object to trial court's answer to a jury question waives claim that the answer violated § 1138].)[9]

Defendant alternatively argues his counsel were constitutionally ineffective for failing to object. " '[I]n order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687-688 [80 L.Ed.2d 674, 693-694, 104 S.Ct. 2052] . . . .) Second, he must also show prejudice flowing from counsel's performance or lack thereof. (*Strickland, supra,* at pp. 691-692 . . . .) Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*In re Avena* (1996) 12 Cal.4th 694, 721 [49 Cal.Rptr.2d 413, 909 P.2d 1017].)

We reject defendant's contention that his counsel were ineffective for failing to object, because even assuming counsel's inaction was unreasonable, no prejudice resulted. (See *People v. Padilla* (1995) 11 Cal.4th 891,

---

[9]Section 1138 provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." This section does not strictly apply here because the jury had not yet commenced its deliberations when the trial court received the juror note at issue.

936 [47 Cal.Rptr.2d 426, 906 P.2d 388], overruled on another point in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673] [appellate court need not determine whether counsel's performance was deficient if there was no prejudice].)

Defendant first argues that the first question concerning his alleged homelessness went to his credibility, a key factor in the case. If he was lying about being homeless, he claims, the jury was more likely to disbelieve the rest of his testimony. When his mother, Marcia Surrell, testified, however, she clarified his living status, explaining that defendant was staying with a friend and that both she and defendant's grandmother helped to support him financially. We presume this accurately reflected defendant's living situation. Failure to object to the trial court's inaction with regard to the juror's first question was thus harmless.

As noted above, the juror's concern over Brooks's description of the person he saw standing over the body was clarified by the witness's rebuttal testimony. Failure to object to the trial court's inaction with regard to the juror's second question was thus also harmless.

As to the juror's concern over the fate of Antoine Johnson, the jury was instructed that Johnson's case had been severed and that Johnson would be tried separately. The jury was specifically instructed: "[D]o not discuss or give any consideration as to why the other persons are not being prosecuted in this trial or whether they have been or will be prosecuted." Just before deliberations commenced, that instruction was repeated. In addition, the jury also was instructed: "As I told you before, the trial of Antoine Johnson has been severed from the trial of Maurice Boyette and Johnson's trial will take place after this trial ends." We assume the jury followed these instructions. (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17 [286 Cal.Rptr. 801, 818 P.2d 84].) Defense counsel's failure to object to the trial court's inaction with regard to the juror's third question was thus harmless.

Finally, with regard to the juror's concern about lie detector tests, the trial court instructed the jury to decide the case on the evidence provided and not to "consider or discuss facts as to which there is no evidence." Once again, we assume the jury followed this instruction and that the curious juror abandoned his concern over the lack of lie detector evidence. Defense counsel's failure to object was thus harmless.

Finding no prejudice flowing from defense counsel's failure to object to the trial court's decision not to respond to the juror's midtrial note, we conclude counsel were not constitutionally ineffective by failing to object and that defendant may fairly be held to have forfeited the issue on appeal.

### 7. Alleged Prosecutorial Misconduct

As explained more fully below, defendant contends the prosecutor committed misconduct on numerous occasions during closing argument. He admits, however, that he did not object to any of these instances of alleged misconduct or request that the jury be admonished. Unless he was excused from objecting, defendant did not preserve any of these objections for presentation on appeal.

There are two exceptions to the general rule of forfeiture, and defendant invokes them both. First, defendant argues the futility exception applies here. "A defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile. [Citations.] In addition, failure to request the jury be admonished does not forfeit the issue for appeal if ' "an admonition would not have cured the harm caused by the misconduct." ' [Citations.] Finally, the absence of a request for a curative admonition does not forfeit the issue for appeal if 'the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request.' [Citations.].)" (*People v. Hill, supra,* 17 Cal.4th at pp. 820-821.)

Defendant claims that several of the trial court's prior rulings disagreeing with positions taken by defense counsel suggest any objection to prosecutorial misconduct would have been futile. Although it is theoretically possible a trial court could be so biased against a defendant—as evidenced by prior rulings—that an appellate court might reasonably conclude further objections would have been futile, such is not the case here. An objection and a request for admonition would have allowed the trial court to remedy any unfairness occasioned by the prosecutor's argument, avoiding any potential harm. We perceive nothing in the record suggesting that an objection to any of the alleged instances of misconduct would have been futile. (See generally *People v. Dennis* (1998) 17 Cal.4th 468, 521 [71 Cal.Rptr.2d 680, 950 P.2d 1035].)

Defendant also argues that interposing an objection to the alleged misconduct would have been futile because an objection would simply have called attention to the prosecutor's improper comments, increasing the harm already done. This exception, of course, would swallow the rule requiring a timely objection and request for admonition, for one always runs the risk of drawing the jury's attention to an improper line of argument by registering an objection. The mere concern of highlighting alleged misconduct by objecting, without more, cannot serve as an exception to the general rule requiring an objection and request for an admonition. We conclude defendant's reliance on the futility exception must be rejected.

As a second (and more familiar) reason why we should find he preserved the issue of the prosecutor's alleged misconduct for appeal, defendant claims his counsel were constitutionally ineffective for failing to have made timely objections and requests for admonitions. As we have noted repeatedly, the mere failure to object rarely rises to a level implicating one's constitutional right to effective legal counsel. (*People v. Williams* (1997) 16 Cal.4th 153, 221 [66 Cal.Rptr.2d 123, 940 P.2d 710].) Here, as we explain, with one small exception (which was harmless), a review of the record reveals no misconduct on the part of the prosecutor, and thus counsel cannot be faulted for failing to object.

### a. *Expressing personal belief in the credibility of witnesses*

Defendant first contends the prosecutor vouched for the credibility of her witnesses. Not so. Although a prosecutor may not personally vouch for the credibility of a witness, a prosecutor may properly argue a witness is telling the truth based on the circumstances of the case. (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1059 [17 Cal.Rptr.2d 174, 846 P.2d 756], revd. on other grounds *sub nom. Stansbury v. California* (1994) 511 U.S. 318 [114 S.Ct. 1526, 128 L.Ed.2d 293].) Here, although the prosecutor argued Guillory was credible, she did so in the context of his being an eyewitness to the crime and argued that aspects of his testimony suggested he was telling the truth. This was permissible argument.

Defendant also complains that the prosecutor argued Dee Thomas and his sister had no motive to lie about Thomas's whereabouts on the night of the shootings. We disagree that this line of argument suggested the prosecutor was privy to undisclosed information and thus constituted improper vouching for Thomas's credibility. It was, instead, simply argument based on inferences from the evidence presented. (For example, the prosecutor argued that Thomas had no reason to lie to obtain leniency in his own unrelated case, because he had already pleaded guilty and was serving his sentence in that case.)

Defendant contends the prosecutor repeatedly called him a liar. This was a permissible argument. "The prosecutor is permitted to urge, in colorful terms, that defense witnesses are not entitled to credence . . . [and] to argue on the basis of inference from the evidence that a defense is fabricated . . . ." (*People v. Pinholster* (1992) 1 Cal.4th 865, 948 [4 Cal.Rptr.2d 765, 824 P.2d 571].) Defendant admits the evidence was conflicting concerning those issues the prosecutor argued defendant lied about (e.g., his alleged homelessness, the alleged threats from Johnson). From this evidence, the prosecutor was thus permitted to argue that defendant was less than truthful.

Defendant asserts the prosecutor improperly implied that his testimony required corroboration. He also claims the prosecutor's argument improperly shifted the burden of proof to him. We disagree. The prosecutor argued that defendant had lied when he claimed he had been placed in protective custody due to threats on his life in jail. In support, the prosecutor argued: "You heard no corroboration of that." Read in context, the prosecutor was merely making the permissible argument that defendant had failed " 'to introduce material evidence or to call logical witnesses' " (*People v. Fierro* (1991) 1 Cal.4th 173, 213 [3 Cal.Rptr.2d 426, 821 P.2d 1302]) to support his story of being threatened in jail. In other words, the prosecutor's argument was that defendant's version of events was *less believable* because there was no corroboration from other sources, not that the jury was *legally prohibited* from crediting his testimony in the absence of corroboration, or that he had failed to meet a burden of proof.

■■■ Defendant argues that the prosecutor committed misconduct by commenting on his demeanor in the courtroom, suggesting he had been affecting a pleasant attitude to deceive the jury. The prosecutor stated: "[Defendant is a v]ery remorseless, cold-blooded individual . . . . Remember, appearances can be very deceiving and he's been working on you. He has been working on you, watching you come and go, smiling and waving when he's introduced to you. Appearances, ladies and gentlemen, can be very deceiving."

■■■ As defendant contends, comment during the guilt phase of a capital trial on a defendant's courtroom demeanor is improper (*People v. Heishman* (1988) 45 Cal.3d 147, 197 [246 Cal.Rptr. 673, 753 P.2d 629]) unless such comment is simply that the jury should ignore a defendant's demeanor (*People v. Stansbury, supra,* 4 Cal.4th at p. 1058). "In criminal trials of guilt, prosecutorial references to a nontestifying defendant's demeanor or behavior in the courtroom have been held improper on three grounds: (1) Demeanor evidence is cognizable and relevant only as it bears on the credibility of a witness. (2) The prosecutorial comment infringes on the defendant's right not to testify. (3) Consideration of the defendant's behavior or demeanor while off the stand violates the rule that criminal conduct cannot be inferred from bad character." (*People v. Heishman, supra,* at p. 197.)

■■■ In this case, the prosecutor's comments were ambiguous. To the extent she was simply urging the jury to disregard defendant's demeanor, there was no misconduct. To the extent she was instead suggesting that the jury should find defendant was duplicitous based on his courtroom demeanor, she committed misconduct. Defendant, of course, chose to testify, reducing any harm to his Fifth Amendment rights. Moreover, the prosecutor's comment was brief and fleeting, further reducing the possibility of

prejudice. In light of the ample evidence both of defendant's lack of credibility and of his guilt, we conclude that, even assuming counsel were remiss in failing to object, no prejudice ensued.

### b. *Misstating the law and facts*

Defendant next contends the prosecutor committed misconduct by misstating the law and facts of the case. Although it is misconduct for the prosecutor to misstate the applicable law (*People v. Marshall* (1996) 13 Cal.4th 799, 831 [55 Cal.Rptr.2d 347, 919 P.2d 1280]) or the facts (*People v. Dennis, supra,* 17 Cal.4th at p. 522), the record reveals no transgression of this rule. For example, defendant complains of the prosecutor's argument that—if the jury believed Guillory's testimony—defendant was "guilty as charged." This essentially was true. Although defendant argues that Guillory did not actually see him shoot the victims, Guillory testified that he saw defendant grab the gun and run after the victims. He then heard the shots and, moments later, after he emerged from the Cole Street house, he saw defendant, still holding the gun, standing over Carter's lifeless body. The prosecutor's argument reasonably may be understood to mean that defendant was guilty if the jury believed Guillory's testimony *and all the reasonable inferences drawn therefrom.*

Defendant also argues that the prosecutor committed misconduct by equating premeditation with "cold-bloodedness" and "malice." We disagree that the prosecutor misstated the law. She first told the jury that defendant had shot Devallier twice as she looked him in the eye and begged for her life. The act, argued the prosecutor, "is so heinous, that is so cold-blooded, . . . that is such an intent to kill, and the law has a word for intent to kill. And it is called malice. And the laws says if you have an intent to kill before you commit the act, which is like pulling a trigger or stabbing, whatever, it is called malice aforethought, and you're in [for] murder." The prosecutor also argued that lying in wait was a substitute for malice. "The law says lying in wait is so serious, so heinous, that it is automatically first degree. It is never second degree. [¶] It is a substitution for malice."

We perceive no misstatement of law. "Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "All murder which is perpetrated by means of . . . lying in wait . . . or by any other kind of willful, deliberate, and premeditated killing . . . is murder of the first degree." (§ 189.) "[P]roof of lying-in-wait . . . acts as the functional equivalent of proof of premeditation, deliberation and intent to kill." (*People v. Ruiz* (1988) 44 Cal.3d 589, 614 [244 Cal.Rptr. 200, 749 P.2d 854].) The prosecutor merely argued that, to kill Devallier under these circumstances,

defendant must have intended to do so and thus killed with malice afore-thought. Although defendant argues the prosecutor erroneously stated that lying in wait is a substitute for malice (instead of premeditation and intent to kill), there is no functional difference in these circumstances: if the jury found defendant lay in wait and thus necessarily premeditated and intended the killings, his argument that he nevertheless lacked malice is—on these facts—untenable. In any event, the trial court properly instructed the jury on the law, and we presume the jury followed those instructions. Indeed, the jury was instructed that, to the extent the law as given by the trial court conflicted with the description of the law as given by the attorneys, the jury was to follow the court's instructions.

### c. *Inflaming the jury*

 Defendant next contends the prosecutor committed misconduct by misstating facts, relying on facts not in evidence, and generally inflaming the passions and fears of the jury. Thus, defendant contends the prosecutor stated—without any support in the record—that defendant killed the victims for money, that people are often killed on the streets of Oakland, and that one often reads about remorseless "teenage kids" intending to kill people. That defendant killed two people who had stolen $3,500 worth of drugs and $1,000 in cash from Johnson, a drug dealer, and thus expected some remuneration from Johnson, was a reasonable inference from the evidence. Defendant admitted that Johnson had provided him with food and clothes. The balance of the challenged comments was mere rhetoric that was not objectionable.

### d. *Encouraging holdout jurors to capitulate*

 Defendant contends, finally, that the prosecutor committed miscon-duct by encouraging holdout jurors to capitulate to the majority. The law requires each juror's independent vote, and " '[u]nanimity obviously requires that each juror must vote for and acquiesce in the verdict. Acquiescence simply because the verdict has been reached by the majority is not an independent judgment, and if permitted, would undermine the right to a unanimous verdict.' " (*People v. Gainer* (1977) 19 Cal.3d 835, 849 [139 Cal.Rptr. 861, 566 P.2d 997, 97 A.L.R.3d 73], quoting *People v. Superior Court (Thomas)* (1967) 67 Cal.2d 929, 932 [64 Cal.Rptr. 327, 434 P.2d 623, 25 A.L.R.3d 1143].)

The prosecutor's argument did not violate this principle. She argued the evidence of guilt was quite strong, "[a]nd if there is one of you who can't see what happened in this courtroom, you're [*sic*] intelligence should be abso-lutely insulted by all the lying that's gone on here, if one of you can't see

that, you['d] better step back, take a deep breath, think about your common sense and listen to your fellow jurors, because you are not seeing the forest through the trees, if you can't see this case. It is overwhelming." As shown, the prosecutor did not exhort holdout jurors to submit to the majority's views, but argued the evidence of guilt was so strong that if any juror had doubts, they should step back and use their common sense. The exhortation to "listen to your fellow jurors" in this context meant to listen to *the arguments* of one's fellow jurors. We find no misconduct.

In sum, save a trivial and harmless comment asking the jury to consider defendant's courtroom demeanor off the witness stand as evidence of his duplicity, which we find nonprejudicial, we find no misconduct. Because defense counsel cannot be considered ineffective for failing to make groundless objections or for failing to make objections to misconduct causing defendant no harm, we further find defendant failed to preserve these claims for appeal.

### 8. *Guilt Phase Instructions*

Defendant contends a number of instructions given to the jury at the guilt phase were incorrect and violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

### a. *Reasonable doubt*

Defendant argues that CALJIC No. 2.90, the standard jury instruction on proof beyond a reasonable doubt given in this case, is faulty because it fails adequately to explain the meaning of the concept of reasonable doubt.[10] As defendant concedes, we have rejected his precise argument (*People v. Seaton* (2001) 26 Cal.4th 598, 668 [110 Cal.Rptr.2d 441, 28 P.3d 175]), as well as his further arguments that certain other instructions that use the term "reasonable" also reduce or dilute the prosecution's burden of proof or constitute an impermissible mandatory presumption (*People v. Mendoza* (2000) 24 Cal.4th 130, 181 [99 Cal.Rptr.2d 485, 6 P.3d 150]; *People v. Crittenden, supra*, 9 Cal.4th at p. 144). He provides no reason to believe our previous decisions on this point were incorrect.

---

[10]CALJIC No. 2.90, as given to the jury, provided: "A defendant in a criminal action is presumed to be innocent until the contrary is proved and[,] in case of a reasonable doubt whether his guilt is satisfactorily shown[,] he's entitled to a verdict of not guilty. [¶] This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt. Reasonable doubt is defined as follows: it is not a mere possible doubt because everything relating to human affairs and depending on moral evidence is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge."

b. *Consciousness of guilt*

The trial court instructed the jury with CALJIC Nos. 2.03, 2.06 and 2.52, the pattern instructions for inferring a consciousness of guilt from the making of false or misleading statements, from the suppression of evidence, and from flight after the crime.[11] Defendant contends these three jury instructions were improper because they were misleading, were not supported by the evidence, and were improper pinpoint instructions lessening the prosecution's burden of proof. Defendant objected to CALJIC Nos. 2.06 and 2.52, but joined the prosecutor in asking for CALJIC No. 2.03. Although normally this would constitute invited error precluding challenging the instruction on appeal (*People v. Hardy* (1992) 2 Cal.4th 86, 152 [5 Cal.Rptr.2d 796, 825 P.2d 781]), we agree with defendant that the record demonstrates no obvious tactical reason why defense counsel wished to have the jury instructed that evidence that defendant gave willfully false or misleading statements could be used to infer a consciousness of guilt. Accordingly, we do not find invited error as to CALJIC No. 2.03. (*People v. Duncan* (1991) 53 Cal.3d 955, 969 [281 Cal.Rptr. 273, 810 P.2d 131].)

Turning to the merits, defendant admits his complaints about CALJIC Nos. 2.03, 2.06 and 2.52 have been rejected in another case. Thus, in *People v. Jackson* (1996) 13 Cal.4th 1164, 1224 [56 Cal.Rptr.2d 49, 920 P.2d 1254], referring to these instructions, we stated: "[E]ach of [these] instructions made clear to the jury that certain types of deceptive or evasive behavior on a defendant's part could indicate consciousness of guilt, while also clarifying that such activity was not of itself sufficient to prove a defendant's guilt, and allowing the jury to determine the weight and significance assigned to such behavior. The cautionary nature of the instructions benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory. [Citations.] We therefore

---

[11]CALJIC No. 2.03, as given to the jury, provided: "If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider such statement as a circumstance tending to prove a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt. And its weight and significance[,] if any, are matters for your determination."

CALJIC No. 2.06, as given to the jury, provided: "If you find that a defendant attempted to suppress evidence against himself in any manner, such as by the intimidation of a witness, such attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt and its weight and significance, if any, are matters for your consideration."

CALJIC No. 2.52, as given to the jury, provided: "The flight of a person immediately after the commission of a crime or after he is accused of a crime is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in light of all the other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."

conclude that these consciousness-of-guilt instructions did not improperly endorse the prosecution's theory or lessen its burden of proof" and thus were not improper pinpoint instructions.

It is unclear why defendant contends these instructions were misleading. To the extent he claims the instructions improperly allowed the jury to draw inferences that would have been rebutted by defense evidence excluded by the trial court, we reject the notion because, as we explained, *ante,* at pages 425-429, the trial court did not err in excluding the testimony of Earl Turner and Latonya Jackson.

We also find the instructions were supported by substantial evidence. There was evidence from which the jury could conclude defendant made numerous false statements to police, that he coordinated a story with Johnson to blame Thomas for the crimes, and that after the killings he engaged in flight with Guillory, Johnson, Banks and Cook.

We conclude the challenged instructions were proper and that they did not violate any of defendant's constitutional rights.

### 9. *Validity of Special Circumstances*

#### a. *In general*

The Eighth Amendment to the United States Constitution requires that the 1978 death penalty law serve a narrowing function to "circumscribe the class of persons eligible for the death penalty." (*Zant v. Stephens* (1983) 462 U.S. 862, 878 [103 S.Ct. 2733, 2743, 77 L.Ed.2d 235].) This function is performed by the requirement that a capital jury sustain at least one statutorily enumerated special circumstance. (*People v. Bacigalupo* (1993) 6 Cal.4th 457, 467-468 [24 Cal.Rptr.2d 808, 862 P.2d 808].) Defendant contends the law contains so many special circumstances that it fails to provide the constitutionally required narrowing function and thus violates the Eighth Amendment by permitting the death penalty to be imposed in an arbitrary and unpredictable fashion. (*California v. Brown* (1987) 479 U.S. 538, 541 [107 S.Ct. 837, 839, 93 L.Ed.2d 934] ["The Constitution instead requires that death penalty statutes be structured so as to prevent the penalty from being administered in an arbitrary and unpredictable fashion"].)

We have held many times that the 1978 law is constitutional. Specifically, as defendant concedes, we have rejected the claim that the number of special circumstances set forth in section 190.2 fails to provide sufficient narrowing of the death-eligible class. (*People v. Bolin* (1998) 18 Cal.4th 297, 345 [75

Cal.Rptr.2d 412, 956 P.2d 374].) Because we conclude the 1978 law is sufficiently narrow to satisfy the Eighth Amendment, we reject defendant's further argument that there is "[b]lanket eligibility for the death sentence" in violation of the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution.

### b. *Multiple-murder special circumstance*

▆▆▆ Defendant also contends the multiple-murder special circumstance in section 190.2, subdivision (a)(3) is impermissibly overbroad. He argues the provision permits an impermissibly wide range of culpable behavior to become grounds for imposing the death penalty. For example, he claims that a defendant convicted of two accidental murders, or two felony murders in circumstances lacking express malice, would qualify for a multiple-murder special circumstance and thus be eligible for the death penalty, although another defendant, convicted of a single cold-blooded and premeditated murder would not be so eligible, though he may be more morally blameworthy.

Defendant did not commit two accidental murders or two murders lacking malice. In any event, categorizing as especially deserving of the ultimate penalty those offenders who kill two or more victims in one criminal event is not arbitrary, unfair or irrational, and performs the necessary narrowing of the pool of potential offenders required by the Eighth Amendment to the United States Constitution. We have so held (*People v. Box* (2000) 23 Cal.4th 1153, 1217 [99 Cal.Rptr.2d 69, 5 P.3d 130]), and defendant does not persuade otherwise.

## II. PENALTY PHASE

### A. *Facts*

#### 1. *Aggravating Evidence*

The People presented evidence from the families of the victims to show the effect the deaths had on their families. Alvarez Devallier, Annette's father, testified and related how close he was with the victim, how her eight-year-old son had said he wanted to die so he could be with his mother, how her six-year-old son had nightmares and would telephone wanting to know where his mother was, and how Annette had been in a drug rehabilitation program and had turned her life around. He identified a photograph of Annette's four-year-old daughter, but admitted he did not see her very often. On cross-examination, he admitted she had had a problem with cocaine

addiction, that as a result her children did not live with her, and that she recently had left the rehabilitation program. He admitted he did not know she was under the influence of cocaine on the night she was killed.

Alvarez Devallier, Jr., Annette's brother, testified he had been very close to his sister until about a year before she was killed, when they went "different ways." He testified he dreamed about her "a lot." Annette's grandmother, Moezelle Lake, testified she "partially raised" Annette and that Annette was very helpful to her as she got older and had greater difficulty getting around. Lake stated, "she was a friend to all, to young and old alike" and is "greatly missed."

Brad Elliot was Gary Carter's brother-in-law. Elliot described Carter's family as large and very close. When asked how Carter's death had affected the Carter family, he replied: "Devastating doesn't even really touch it." Elliot's wife, Yolanda, is Carter's sister, and she wakes in the middle of the night crying about Carter's death. She had problems at work as a result of the killing. Carter's oldest brother was so distraught by the slaying that he moved from the area. Yolanda Elliot testified herself and confirmed that, following the slaying, she had difficulty sleeping, was depressed all the time, and was in therapy. She said she had lost a lot of weight and had had trouble caring for her son.

Two more of Carter's sisters also testified and expressed how Carter's death had affected them. One, Antonea Brown, described how their father had an especially hard time dealing with his son's death: "It's to the point where he can't even look at us, his kids any more, because he—he said it was so painful for him to lose Gary, just the idea of losing another child, he just doesn't want to be . . . around us any more."

Carter had three children, and one of them, his 15-year-old daughter, Laveone Carter, testified. She stated she had nightmares following the killing and that her brother was too upset to come to court to testify. Her sister now got angry over little things and stared at their father's picture and cries.

The prosecutor closed the case in aggravation by noting that defendant had stipulated to having suffered two prior drug-related felony convictions.

## 2. *Mitigating Evidence*

Defendant began his presentation at the penalty phase by calling three mental health experts to the stand. Dr. Fred Rosenthal, a psychiatrist,

testified that defendant had no diagnosable mental disorder or psychosis but was too young to allow the observation of a full-blown mental disease. Dr. Rosenthal found that defendant suffered from emotional problems in that he was a very immature, passive and dependent person who had difficulty making independent decisions. He was easily influenced by peer pressure, very vulnerable, and sensitive to criticism. People with this emotional condition will gravitate to any strong leader for guidance. Although 20 years old, he functioned as a teenager both emotionally and intellectually.

Dr. William Lane Spivey, a psychologist, testified that he began seeing defendant in 1983 because he had been having adjustment problems at home and was not performing well in school. Dr. Spivey last saw defendant in 1988. He found defendant to be "a kid groping to grow up. Fairly low self-esteem, a lot of adjustment issues at school as well as in the family. It was a kid trying to find his identity at the time." Defendant was being raised by his grandmother, who loved him; he was very immature for his age and felt acutely the absence of his mother. Defendant spoke often of growing up and rescuing his mother in some way.

George Barrett has a master's degree in clinical psychology and works for Alameda County Mental Health Services, which takes court referrals when the court believes someone is having a mental or emotional problem. In this capacity, he examined defendant in 1991 when defendant was 18 years old. Barrett described defendant as "an 18 year old who speaks and thinks in the style of a 12 year old."

The defense then presented the testimony of several of defendant's relatives in mitigation. Tamika Harris, defendant's 17-year-old cousin, testified she had known and lived with defendant almost her entire life. She said kids teased him at school "because he was kind of heavy and bigger than the other kids." He would never start fights and was not the type to go out and cause trouble. She stated on cross-examination that her father and grandmother loved defendant very much and that he was not an abused child. Marlon Surrell, also defendant's cousin, testified he was raised in the same household as defendant. He tried to discourage defendant from associating with Antoine Johnson, but defendant would not listen.

Defendant's grandmother, Irma Surrell, testified that defendant had lived with her since he was two years old, although lately he had stayed with her only sporadically. He was like a son to her, and she loved him very much. She took him to see Dr. Spivey when he was young because "he had trouble with his mind and he wasn't making good connections with his mind." She

raised defendant because his mother was addicted to drugs. His father, who rarely came to see defendant, died when defendant was 14. On cross-examination, the prosecutor asked whether she recalled an incident when defendant became angry with his mother and threatened to kill his grandfather and himself with a knife. She said she did not know anything about the incident and maintained that position after being shown a police report about the incident. She said defendant never told her he had killed anyone, and she did not know he had admitted to any murders.

Two of defendant's aunts, Celeste Surrell and Charmaine Adams, testified that they had helped their mother raise defendant because his mother was a drug addict. Celeste Surrell testified that defendant was not a disruptive child, but a passive one. Both women noted that defendant was concerned about his mother and would go check on her at the Cole Street house from time to time.

Eugene Surrell, defendant's grandfather, also testified and said that when defendant was quite young, his mother took him to Sacramento while under the influence of drugs, left him at a house, and could not remember where the house was or with whom she had left him. It was at that time the decision was made to have his wife, Irma, raise defendant. He helped raise defendant, and defendant would often call him for advice. He denied that defendant had ever threatened him with a knife, but stated that he would sometimes throw temper tantrums. He affirmed that defendant was a follower and that much younger children would lead him around. He found kids leading defendant to a known drug-selling area in Berkeley; he tried to break up the arrangement, but found defendant there again a month later. A drug dealer was having defendant hold his drugs in his pocket while the dealer sold them.

### B. *Discussion*

#### 1. *Victim Impact Evidence*

Defendant contends that the extent and nature of the victim impact evidence admitted at the penalty phase of trial was improper. Prior to 1991, evidence of a murder's impact on a victim and the victim's family and friends was not admissible in the penalty phase of a capital trial. (*Booth v. Maryland* (1987) 482 U.S. 496, 501-502 [107 S.Ct. 2529, 2532-2533, 96 L.Ed.2d 440]; *People v. Ochoa* (1998) 19 Cal.4th 353, 455, fn. 9 [79 Cal.Rptr.2d 408, 966 P.2d 442].) The federal high court later reversed itself in *Payne v. Tennessee* (1991) 501 U.S. 808 [111 S.Ct. 2597, 115 L.Ed.2d 720] (*Payne*), deciding that "[v]ictim impact evidence is simply another

form or method of informing the sentencing authority about the specific harm caused by the crime in question" (*id.* at p. 825 [111 S.Ct. at p. 2608]) and was thus admissible evidence. We have followed the high court's lead (*People v. Taylor* (2001) 26 Cal.4th 1155, 1171-1172 [113 Cal.Rptr.2d 827, 34 P.3d 937]) and have also found such victim impact evidence admissible as a circumstance of the crime pursuant to section 190.3, factor (a) (*People v. Stanley* (1995) 10 Cal.4th 764, 832 [42 Cal.Rptr.2d 543, 897 P.2d 481]).

Because both defendant's crime and his trial occurred after *Payne* had been decided, his case is controlled by *Payne.* Because victim impact evidence is now admissible as a constitutional and a statutory matter, defendant clarifies his argument that the evidence was improper by asserting that the evidence was so inflammatory it tended to encourage the jury towards irrationality and an emotional response untethered to the facts of the case, rendering his trial fundamentally unfair under the due process clause of the Fourteenth Amendment to the United States Constitution. (*Payne, supra,* 501 U.S. at p. 825 [111 S.Ct. at p. 2608] [leaving this avenue of relief open]; *People v. Hardy, supra,* 2 Cal.4th at p. 200.)

We have reviewed the victim impact evidence admitted at the penalty phase of trial, together with the prosecutor's opening and closing arguments, and conclude the admission of the evidence did not surpass constitutional limits. Family members spoke of their love of the victims and how they missed having the victims in their lives. The prosecutor also introduced photographs of the victims while still alive. In her argument, the prosecutor emphasized the victim impact evidence, but also spoke of the relevance of the facts of the crime itself, as well as other aspects about defendant that (she argued) demonstrated why the death penalty was appropriate for him and a life sentence was not. The evidence was relevant and the argument appropriate. We find no danger that the jury's rationality was overborne and thus find no constitutional violation.

Defendant argues that the trial court erred in ruling he would not be allowed to counteract the effect of the victim impact evidence by cross-examining family members to elicit evidence that showed the victims were not the cherished family members the witnesses claimed them to be. For example, the trial court upheld the prosecutor's objection when defendant attempted to elicit from Brad Elliot, Gary Carter's brother-in-law, that Carter had twice been sent to prison. The trial court ruled that defendant was improperly disparaging the victim's character. Defendant was able to establish, however, that Annette Devallier had left her rehabilitation program and was under the influence of cocaine at the time of her death.

There was no error and, in any event, no prejudice. Testimony from the victims' family members was relevant to show how the killings affected *them*, not whether they were *justified* in their feelings due to the victims' good nature and sterling character. Accordingly, defendant was not entitled to disparage the character of the victims on cross-examination. Even if we assume for argument that the trial court erred, there was no prejudice; the several family members who testified did so briefly and relatively dispassionately. The jury was aware from the evidence adduced at the guilt phase that the victims were probably drug addicts and were killed in a dispute at a disreputable house at which drug addicts congregated. In short, the jury already knew the victims were not upstanding citizens, so defendant's inability to emphasize this point in cross-examination could not have affected the penalty judgment. In concluding there was no error and no prejudice, we also reject the claims that the trial court's evidentiary rulings on this topic deprived defendant of his rights to due process, to a fair trial, to confront and cross-examine the witnesses against him, and to a reliable, individualized and nonarbitrary penalty determination. (U.S. Const., 5th, 6th, 8th & 14th Amends.) Also, finding no error, we need not address defendant's further claim that "[t]he error *was compounded* because the jury was never instructed . . . how to consider this evidence." (Italics added.)

In addition, defendant argues that the victim impact evidence admitted in this case was not relevant to a statutorily specified category of aggravating evidence and was thus error under state law despite *Payne, supra,* 501 U.S. 808. (See *People v. Boyd* (1985) 38 Cal.3d 762, 775 [215 Cal.Rptr. 1, 700 P.2d 782] [aggravating evidence limited to statutory categories].) We disagree. Such evidence was admissible under section 190.3, factor (a), which permits the jury to consider the circumstances of the crime. (*People v. Hardy, supra,* 2 Cal.4th at p. 201.)[12]

---

[12]Finding no state law violation, we also reject defendant's further claim that he was denied a state-law-created liberty interest under the federal due process clause of the Fourteenth Amendment to the United States Constitution (*Hicks v. Oklahoma, supra,* 447 U.S. 343), an argument we find farfetched in any event. We also reject the claim that the scope of state law (with regard to the admissibility of victim impact evidence) was impermissibly broadened in violation of his right to due process (*Bouie v. City of Columbia* (1964) 378 U.S. 347 [84 S.Ct. 1697, 12 L.Ed.2d 894]), because we are not broadening the prior law; we are applying the law in effect at the time defendant committed his crimes.

Finally, we reject defendant's argument that, if section 190.3, factor (a) ("circumstances of the crime") is interpreted to include a broad array of victim impact evidence, it is unconstitutionally vague. Both the high court (*Tuilaepa v. California* (1994) 512 U.S. 967, 976 [114 S.Ct. 2630, 2637, 129 L.Ed.2d 750]) and this court (*People v. Kraft, supra,* 23 Cal.4th at p. 1078) have concluded section 190.3, factor (a) is not unconstitutionally vague. Although those decisions were not in the context of permitting a broad array of victim impact evidence, we nevertheless find them applicable here, for the "circumstances of the crime" reasonably include how the victims' deaths affected surviving family members.

### 2. *Alleged Prosecutorial Misconduct*

Defendant contends the prosecutor committed various forms of misconduct in her opening and closing statements, and in cross-examining defense witnesses at the penalty phase. As explained below, many of the claims were not preserved for appellate review, and those claims that are properly before this court lack merit.

### a. *Future dangerousness/gang affiliation*

■ Defendant first contends the prosecutor improperly argued in her opening and closing statements that, if spared the death penalty, defendant posed a danger to other inmates and to people employed in prisons. Defendant also claims the prosecutor committed misconduct in her cross-examination of Dr. Rosenthal when she suggested defendant would become a hit man for the Black Guerrilla Family (BGF), an African-American prison gang.

The law is settled: expert testimony that a capital defendant will pose a danger in the future if his life is spared is inadmissible (*People v. Murtishaw* (1981) 29 Cal.3d 733, 773-775 [175 Cal.Rptr. 738, 631 P.2d 446]), but "prosecutorial argument regarding defendant's future dangerousness is permissible when based on evidence of the defendant's conduct rather than expert opinion" (*People v. Ervin* (2000) 22 Cal.4th 48, 99 [91 Cal.Rptr.2d 623, 990 P.2d 506]). Because expert evidence of future dangerousness is not barred by the United States Constitution (*Barefoot v. Estelle* (1983) 463 U.S. 880, 896-903 [103 S.Ct. 3383, 3396-3400, 77 L.Ed.2d 1090]), we reject at the threshold defendant's claims that the prosecutor's argument and cross-examination denied him due process or his right to a reliable penalty determination under the Eighth Amendment to the United States Constitution.

We turn first to the prosecutor's opening remarks. She stated: "It is the People's position that the circumstances that I presented to you, the cold, calculated manner in which Mr. Boyette executed two people shows you that there is a strong likelihood that he would kill again. And you have to ask yourselves, do you want to put more families through that?" At this point, defense counsel objected, claiming this was "improper argument." The trial court impliedly overruled the objection, instructing the prosecutor to continue with her argument. She then concluded her opening remarks without revisiting the topic.

Although defendant preserved this claim for appeal, we find no misconduct, for the prosecutor's argument was based on the evidence presented or

what she anticipated presenting. The evidence did indeed show that defendant killed two people in cold blood, including shooting Annette Devallier twice in the face at point-blank range as she begged for mercy. Relying on this evidence, the prosecutor was permitted to argue that defendant was a remorseless killer and that, having exhibited no twinge of conscience when he killed Devallier and Carter, he would likely kill again if allowed to live. Moreover, the victim impact evidence the prosecutor presented from the victims' families supported her rhetorical question regarding the families of future victims.

 Defendant also argues the prosecutor committed misconduct in her cross-examination of Dr. Rosenthal. During her cross-examination, the prosecutor attempted to elicit a concession that defendant's immaturity and dependent personality would make it likely that, if sentenced to life in prison, he would come under the influence of the BGF and be led to commit additional crimes in prison. Defense counsel objected that this was irrelevant, but it does not appear the trial court ruled on the initial objection, although it sustained a second objection that the questioning was argumentative. Dr. Rosenthal answered that he did not know very much about the BGF; that people suffering from defendant's condition do not necessarily need a gang for guidance; that defendant would gravitate toward any strong individual; and that to the extent the prosecutor was implying that defendant would be particularly susceptible to gang influence in prison, she may be "oversimplifying this situation." When asked directly whether, if defendant got "caught up" with the wrong crowd, they would influence him to commit crimes, Dr. Rosenthal replied: "I'm not saying that."

Respondent argues that defendant forfeited this claim for appeal because, although he objected, he failed to request that the jury be admonished. As he did for his claim of prosecutorial misconduct at the guilt phase, defendant contends we should excuse his failure to request an admonition because it would have been futile to do so and, if not, that his defense counsel were ineffective for failing to make the request. (See *ante*, at pt. I.B.7.) As with his guilt phase claims, nothing in the record supports the conclusion that a request to admonish the jury would have been futile, nor that counsel's failure so to request was prejudicial so as to constitute ineffective assistance. We thus find the issue was not adequately preserved for our review.

Had defendant preserved this claim, we would find the prosecutor's questioning when cross-examining Dr. Rosenthal approaches, if not crosses, the line separating permissible from impermissible cross-examination. Had defendant elicited evidence that he lacked the capacity for future dangerousness, the prosecutor would have been entitled to cross-examine Dr.

Rosenthal on that subject. (*People v. Earp* (1999) 20 Cal.4th 826, 894 [85 Cal.Rptr.2d 857, 978 P.2d 15]; *People v. Ochoa, supra*, 19 Cal.4th at p. 463.) Defense counsel, however, did not ask the witness questions about defendant's future dangerousness. It thus appears the prosecutor's questions were an attempt to elicit prohibited expert evidence on future dangerousness.

Even assuming the prosecutor committed misconduct by asking Dr. Rosenthal to predict defendant's propensity for future violence, there was no prejudice because the witness did not agree with the implied premise of the prosecutor's line of questioning, replying that the prosecutor was "oversimplifying this situation" and that he was "not saying" defendant would necessarily become involved in prison gangs due to his dependent personality. The jury was instructed that "[s]tatements made by the attorneys during the trial are not evidence" and that "[e]vidence consists of testimony of witnesses." We assume the jury followed these instructions.

Defendant also complains that the prosecutor returned to this allegedly improper theme in closing argument. Indeed, the prosecutor made this point repeatedly, arguing that Dr. Rosenthal "talks out of both sides of his mouth. When it helps him, he's real plain, he goes along with the show, but as soon as I start mentioning gangs, because you know what I'm getting at, his likelihood of killing again, his future dangerousness. The perfect personality who could kill again." Defense counsel then objected, explaining, "there's no testimony as to gangs in this case." The court apparently overruled the objection, saying: "There is no evidence of gangs, no, [but] she's—as I understand, she's arguing his future dangerousness based upon the present evidence." The prosecutor continued: "You have to look at his future dangerousness. Is this a remorseful person who really blew it one night or is this a sociopath who's going to kill again?"

This exchange demonstrates that the prosecutor was not relying on any expert testimony but was arguing that the facts of the crime showed an absence of remorse and, from that absence, the jury could infer defendant was a threat to kill again. This was permissible argument. (*People v. Ervin, supra*, 22 Cal.4th at p. 99.)

### b. *Use of hypothetical questions*

Defendant next contends the prosecutor committed misconduct during her cross-examination of Dr. Rosenthal by asking him a series of hypothetical questions based on facts not in evidence. By employing this method of questioning, defendant claims the prosecutor placed before the jury information that was never admitted into evidence and which he had no

opportunity to confront, thereby violating his constitutional rights to due process, a fair trial, to confront and cross-examine witnesses against him, and for a reliable penalty verdict. (U.S. Const., 5th, 6th, 8th & 14th Amends.)

 Within limits, the law permits the examination of an expert witness with hypothetical facts. "Generally, an expert may render opinion testimony on the basis of facts given 'in a hypothetical question that asks the expert to assume their truth.' (1 McCormick on Evidence (4th ed. 1992) § 14, p. 58.) Such a hypothetical question must be rooted in facts shown by the evidence, however." (*People v. Gardeley* (1996) 14 Cal.4th 605, 618 [59 Cal.Rptr.2d 356, 927 P.2d 713].) "A hypothetical question . . . may be 'framed upon any theory which can be deduced' from *any* evidence properly admitted at trial, including the assumption of 'any facts within the limits of the evidence,' and a prosecutor may elicit an expert opinion by employing a hypothetical based upon such evidence." (*People v. Sims* (1993) 5 Cal.4th 405, 436, fn. 6 [20 Cal.Rptr.2d 537, 853 P.2d 992]; see 3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, § 194, pp. 258-260.) The hypothetical statement of facts posed to an expert witness need not be limited to evidence already admitted into evidence, "so long as it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions. [Citations.] Of course, any material that forms the basis of an expert's opinion testimony must be reliable. [Citation.] For 'the law does not accord to the expert's opinion the same degree of credence or integrity as it does the data underlying the opinion. Like a house built on sand, the expert's opinion is no better than the facts on which it is based.' " (*People v. Gardeley, supra*, at p. 618.)

Although the field of permissible hypothetical questions is broad, a party cannot use this method of questioning a witness to place before the jury facts divorced from the actual evidence and for which no evidence is ever introduced. The prosecutor often approached and sometimes crossed this line separating permissible from impermissible hypothetical questioning, and the trial court erred by failing to limit the prosecutor's questioning. Considered in the aggregate, however, we find defendant suffered no prejudice as a result.

 In the first instance of alleged misconduct, the prosecutor asked Dr. Rosenthal—who had testified he had not spoken to any of the witnesses or read any of their reports—to assume that he had spoken to the witnesses and found them credible; that they told him that Johnson shot at Gary Carter; that Annette Devallier dragged Carter from the house; that defendant grabbed the gun and pursued Carter and Devallier; that defendant shot Devallier as she

knelt before him and begged for her life; that he then shot Carter as he lay on the ground; and that another witness, Kenya Lita Cook, heard Carter also say, "Please don't," before defendant killed him. Defense counsel objected, claiming the prosecutor had engaged in misconduct because Cook had not testified. The trial court overruled the objection, explaining, "It is within the realm of probability." The prosecutor finished her question by asking that, assuming all those facts to be true, "are you claiming somehow that [defendant] [was] not acting under his own free will?" The witness replied that he could not answer the question because he did not evaluate defendant's mental state at the time of the crime.

All the facts included in the prosecutor's hypothetical, save one, were established by, or reasonably inferable from, the evidence already admitted at trial and thus were permissible grounds for a hypothetical question. Most damning was defendant's own admission in his July 30th statements that Devallier said "please don't do it" before he shot her twice at point-blank range. His statement was played for the jury. Defendant strongly objects to the prosecutor's use of hypothetical facts from Kenya Lita Cook, for Cook did not testify at trial. We agree trial courts should be wary of parties using the mechanism of a hypothetical question to suggest to the jury that evidence exists that was not presented at trial. Although there was evidence from which it could be reasonably inferred that Cook was a percipient witness to Carter's shooting (defendant admitted Cook was at the scene and that, after he shot Carter, he looked up and saw Cook on the porch of the Cole Street house), there was no evidence that Carter said anything before defendant shot him. Accordingly, that portion of the prosecutor's hypothetical question was improper.

In the second instance of misconduct, the prosecutor asked Dr. Rosenthal to assume he had spoken with a probation officer named Maylene Pastor, that he found her credible, and that she had told him defendant "was extremely manipulative." She then asked, "Would that change your opinion that [defendant] was manipulating you?" Dr. Rosenthal answered that he did not think defendant was manipulating him. Because the prosecutor did not present any evidence from a probation officer named Maylene Pastor, defendant contends this was an improper hypothetical question. He failed to object to this question, however, thereby forfeiting the claim. Even assuming the issue is properly before us, we find no prejudice: Dr. Rosenthal did not change his mind as a result of the assertedly improper question and—from defendant's many changes of his story—the jury was already well aware of his potential to manipulate the truth.

In the third use of an allegedly improper hypothetical question, the prosecutor began by asking Dr. Rosenthal to assume he had spoken to

someone named Mat Shearson, although the prosecutor had not presented any evidence from Shearson. When the trial court sustained a defense objection, the prosecutor continued the question without mentioning any names. Thus, the prosecutor asked the witness to assume defendant, "with a group of several other Black males was standing on the sidewalk, and a White individual walked by and the defendant went up and hit him for no apparent reason. [¶] Is that the kind of act you're talking about when you talk about antisocial behavior?" Contrary to respondent's contention, defense counsel made a continuing objection to this line of questioning, thereby preserving the issue for appellate review.

We conclude the question was an improper hypothetical question. The People did not present any evidence at the penalty phase that defendant had previously assaulted a White victim, nor was there any evidence from which such a hypothetical state of affairs could reasonably be inferred. The harm flowing from the improper question is twofold. First, the question implied evidence of an additional aggravating factor for which defendant had received neither notice nor an opportunity to defend. Second, because a racially motivated attack was suggested, the improper question injected the specter of racial prejudice into the trial. For these reasons, the trial court erred in failing to sustain defendant's continuing objection to this line of questioning.

The fourth and fifth uses of allegedly improper hypothetical questions were similar, and we may reach the issues because they were preserved by trial counsel's continuing objection. The prosecutor asked Dr. Rosenthal to assume that defendant had threatened a jail inmate named James Webb because he was a snitch and also to assume that defendant had assaulted an inmate named McLain. Although the prosecutor earlier had asked defendant questions about these incidents, defendant denied them, and the prosecutor never introduced any evidence to support these hypothetical questions.[13] Accordingly, the questions were improper. Although respondent contends the prosecutor's questions were supported by the testimony of George Barrett, we disagree. Under defense counsel's questioning, Barrett testified that defendant had been referred to him "because the [trial] court was concerned because [defendant] had made threats . . . death threats to others and himself." Such general and nonspecific evidence was insufficient to establish a good faith belief in the specific accusations inherent in the prosecutor's hypothetical questions that defendant had threatened a jail inmate named James Webb and had assaulted an inmate named McLain.

---

[13]The prosecutor purported to be relying on a police report, but the trial court sustained defense counsel's hearsay objection to the report. It was marked for identification but never introduced into evidence.

We find defendant's claim of a sixth instance of an allegedly improper hypothetical question also has merit. Defendant argues the prosecutor improperly asked Dr. Rosenthal whether the fact that defendant had threatened to kill his grandfather with a knife was "important in the diagnosis." When the prosecutor later cross-examined Irma Surrell, defendant's grandmother, about the incident, she said she did not remember it, although the prosecutor showed her a police report of the incident to refresh her recollection. Surrell's husband, Eugene, also denied that defendant had threatened him. The police report, although marked for identification, was never formally introduced into evidence. There was thus no evidence of the alleged incident.

As described above, the prosecutor was aggressive in using hypothetical questions to make her point. She exacerbated the potential for prejudice by suggesting in closing argument that she had evidence in her possession that supported her line of questioning, but simply chose not to present it in the interest of saving the jury time. Thus, she stated: "I don't need [to] bring in those witnesses in order to ask a hypothetical [question] to that witness. And you notice I did not bring in those witnesses. Those pale in comparison to what you already have in front of you. You are not going to find the death penalty because of some assaults and batteries. *So I did not waste your time with that type of information.*" (Italics added.) Suggesting that she had witnesses who would have testified to certain facts when she did not call such witnesses is misconduct. (*People v. Hill, supra,* 17 Cal.4th at p. 829.)

 Although the potential for prejudice exists, we find the potential was not realized. First, the jury was instructed with CALJIC No. 2.82 as follows: "In examining an expert witness, counsel may propound to him a type of question known in the law as a hypothetical question. By such a question, the witness is asked to assume to be true a set of facts and to give an opinion based on that assumption. *In determining such a question, the court does not rule and does not necessarily find that all the assumed facts have been proved.* It only determines that those assumed facts are within the probable or possible range of the evidence. *It is for you the jury to find from all the evidence whether or not the facts assumed in a hypothetical question have been proved.* [¶] If you should find that any assumption in such a question has not been proved, you are to determine the effect of that failure of proof on the value and weight of the expert opinion based [on] the assumed facts." (Italics added.) The trial court thus instructed the jury not to assume that the facts underlying a hypothetical question were true.[14]

Second, and more importantly, when instructing the jury on the statutory aggravating and mitigating factors, *the trial court expressly informed the jury*

---

[14]Defendant focuses on the sentence in the instruction that states: "[The trial court] only determines that those assumed facts are within the probable or possible range of the

*that the prosecution had not presented any evidence of other criminal activity that it could consider pursuant to section 190.3, factor (b).* Thus, the court instructed the jury: "You shall consider, take into account and be guided by the following factors if applicable: [¶] . . . [¶] B, the presence or absence of criminal activity by the defendant other than the crimes for which the defendant has been tried in the present proceedings which involve the use or attempted use of force or violence or the express or implied threat to use force or violence. [¶] *And the court, in effect, made the finding that no evidence of such criminal activity was produced by the prosecution.*" (Italics added.) We presume the jury followed this instruction. (*People v. Morales* (2001) 25 Cal.4th 34, 47 [104 Cal.Rptr.2d 582, 18 P.3d 11].)

Third, the jury was instructed that "[s]tatements made by the attorneys during the trial are not evidence" and that "[e]vidence consists of testimony of witnesses," reducing the chance the jury relied on the improper questions. We thus conclude any misconduct was harmless.[15]

### c. *Reliance on defendant's failure to testify and lack of remorse*

 Defendant next contends the prosecutor committed misconduct by commenting on his failure to testify and express remorse. The Fifth Amendment to the United States Constitution prohibits a prosecutor from commenting on a criminal defendant's invocation of his constitutional right to remain silent in the face of criminal charges. (*Griffin v. California* (1965) 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106] (*Griffin*).) At the guilt phase of a trial, "[d]irecting a jury's attention to a defendant's failure to testify at trial runs the risk of inviting the jury to consider the defendant's silence as evidence of guilt." (*People v. Lewis* (2001) 25 Cal.4th 610, 670 [106 Cal.Rptr.2d 629, 22 P.3d 392].) "[T]he prosecution may comment upon a defendant's lack of remorse, [but] in doing so it may not refer to the

---

evidence." From this, he argues that the trial court gave its imprimatur on the prosecutor's line of questioning. The identified sentence, read in context with the entire instruction, clearly indicates the trial court was not conveying to the jury that it believed the prosecutor had a sufficient factual basis for her questions, but that it was for the jury to decide that issue.

[15]We also reject defendant's subsidiary claims related to this topic. Thus, to the extent he claims the prosecutor misconducted herself by introducing aggravating evidence without proper statutory notice, we conclude defendant forfeited the claim by not objecting on that ground. To the extent he claims it was misconduct to rely on nonstatutory aggravating evidence (see *People v. Boyd, supra,* 38 Cal.3d at p. 775), we find this claim also forfeited and, in any event, the challenged evidence was either evidence of the crime itself (§ 190.3, factor (a)) or evidence of other criminal activity (§ 190.3, factor (b)). We also reject defendant's further claim that he was denied several federal constitutional rights as a result of the prosecutor's use of hypothetical questions. Use of hypothetical questions in this case did not render his trial fundamentally unfair or the penalty determination unreliable or arbitrary, and did not deprive him of any liberty interest created in state law.

defendant's failure to testify. [Citations.] Similarly, we have recognized that a prosecutor may not urge that a defendant's failure to take the stand at the penalty phase, in order to confess his guilt after having been found guilty, demonstrates a lack of remorse." (*People v. Crittenden, supra*, 9 Cal.4th at p. 147.)

 Defendant cites three instances in which he claims the prosecutor committed this type of misconduct. First, the prosecutor stated in closing argument that defendant's two prior drug-related felony convictions would assist the jury in determining defendant's credibility, and that "if he were to—somehow, God forbid take the stand and say he was sorry, which you didn't see." Defense counsel immediately objected, citing *Griffin, supra*, 380 U.S. 609, but his objection was overruled, apparently on the ground that defendant had testified at the guilt phase. The trial court erred by overruling defendant's objection, as he did not testify at the penalty phase, the phase of trial in which he might express remorse and to which the prosecutor apparently was referring. The prosecutor's argument thus ran afoul of the rule prohibiting her from urging that a defendant should have testified at the penalty phase to express remorse. (*People v. Crittenden, supra*, 9 Cal.4th at p. 147.)

We reject respondent's attempt to characterize this argument as outside *Griffin*'s prohibition. Respondent claims the prosecutor's argument "simply refer[red] to [defendant's] failure to testify truthfully or express remorse." This argument ignores the phraseology of the prosecutor's statement: "*if* he were to . . . take the stand and say he was sorry, which you didn't see." (Italics added.) The statement does not refer "simply" to defendant's failure to tell the truth; it clearly refers to defendant's failure to take the stand at the penalty phase. We thus find the prosecutor committed misconduct.

Defendant argues the prosecutor repeated this misconduct later in her argument when she revisited the same theme: "So you have the lying and you have the lack of remorse. There was so much lack of remorse, and so much lying in this case, that I drew up a whole separate chart on it.

"And I will come back to this.

"He shoots Carter, and there's no remorse. Let's talk about the definition of remorse. I looked it up in the dictionary:

" 'A deep torturing sense of guilt felt over a wrong that one has done.'

"Which we know sociopaths can't do. He shoots Carter, no remorse. Killed Annette, no remorse. Shoots Carter again, it's getting easier. No remorse.

"He tells Guillory: 'You don't know anything.' 'We smoked 'em.' 'You tell anyone and I will smoke you and your family.'

"Real remorseful.

"The defendant lies to the police, and he's really good on that tape. He's really good. The detail, his voice, his inflection. No remorse there.

"Defendant lies to the judge, no remorse.

"He lies to you, still no remorse.

"Not once has he said he's sorry. He just keeps on denying it. Not me."

Defendant did not object to this line of argument, and thus any claim of prosecutorial misconduct was not preserved for appeal. Assuming the issue is properly before us, we find no misconduct, for the prosecutor did not refer to defendant's failure to testify. Her argument that the facts failed to show defendant exhibited any remorse was permissible. (*People v. Marshall, supra,* 13 Cal.4th at p. 855.)

Third, defendant contends the prosecutor committed misconduct in asking Dr. Rosenthal at the penalty phase whether a lack of remorse was consistent with a diagnosis of an antisocial personality disorder. He answered in the affirmative, but had previously testified that defendant denied to him having committed the murders, thereby undercutting much of the motivation for defendant to express remorse. Although defendant preserved this claim by objecting, we find no misconduct because the prosecutor was merely cross-examining the witness as to the scope of his diagnosis and did not comment on defendant's failure to testify at the penalty phase or otherwise express remorse.

Although we find one instance in which the prosecutor improperly suggested that defendant should have testified and expressed remorse, it was a brief and solitary comment. The prosecutor later in her argument extensively emphasized defendant's lack of remorse without any objection by the defense, rendering any earlier misconduct harmless. " '[I]ndirect, brief and mild references to a defendant's failure to testify, without any suggestion

that an inference of guilt be drawn therefrom, are uniformly held to constitute harmless error.'" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1340 [65 Cal.Rptr.2d 145, 939 P.2d 259].)[16]

### d. *Reference to societal violence*

 Defendant next contends the prosecutor committed misconduct by commenting on murders in society in general "and the jury's obligation to do something to stop" the violence. Defendant contends this line of argument diverted the jury from reaching a reasoned, moral response to defendant's crimes and thus prevented it from reaching an "individualized and reliable sentencing determination." Defendant did not preserve this claim by objecting at trial. Assuming the issue is properly before this court, we find the argument was a permissible rhetorical response to the thrust of the defense position that defendant's youth, immaturity, and the circumstances in which he lived justified mercy. "Whereas a prosecutor commits misconduct in making comments calculated to arouse passion or prejudice [citation], the comments in this case were not so calculated." (*People v. Bradford, supra,* 15 Cal.4th at p. 1379.)

### e. *Urging the jurors to excuse themselves if they cannot vote for a death sentence*

 Defendant next contends the prosecutor committed misconduct by encouraging the jurors to excuse themselves from the jury if they found they could not vote for a death sentence, and (he claims) by urging those jurors favoring a life sentence to defer to the other jurors who were more "street

---

[16]We also reject several subsidiary claims related to this primary contention. First, we reject the claim that the prosecutor's argument regarding defendant's lack of remorse was misconduct because it relied on nonstatutory aggravating evidence. (See *People v. Boyd, supra,* 38 Cal.3d at p. 775.) This claim was forfeited for lack of a proper objection and, in any event, "[a] prosecutor may properly comment on a defendant's lack of remorse, as relevant to the question of whether remorse is present as a mitigating circumstance, so long as the prosecutor does not suggest that lack of remorse is an aggravating factor." (*People v. Mendoza, supra,* 24 Cal.4th at p. 187.)

Second, we reject the claim that the prosecutor's argument improperly converted the absence of a mitigating factor into an aggravating one. (See *People v. Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861].) This claim also was forfeited for lack of a proper objection. There being no argument that the absence of a mitigating factor is aggravating, it is also meritless.

Third, we also reject defendant's further claim that he was denied several federal constitutional rights as a result of the prosecutor's argument regarding remorse. Though the prosecutor made a brief comment that improperly touched on defendant's right not to testify at the penalty phase, that passing comment did not render his trial fundamentally unfair or the penalty determination unreliable or arbitrary, and did not deprive him of any liberty interest created in state law.

smart." Defendant failed to object on either of these grounds and thus failed to preserve either issue for appeal. Assuming the issues are properly before us, we find the record does not support the contention that misconduct occurred.

The prosecutor first told the jury: "You're not advocates or opponents for the death penalty at this stage in the proceedings. You are to decide what you think is morally appropriate as a jury.

"And you remember I asked every single one of you: Can you do it? Can you come down in court, return a verdict, knowing he would be put to death?

"And every one of you said you could.

"*Now, if you find that this is just too much for you and you cannot deliberate in a case like this, you must let us know. We have alternates.*

"And I think in this part of the proceeding, it is a very different type of proceeding, it's emotional, you need your street smarts, you can't be naive about these things. I recommend you pick a very street smart foreman. A very street smart foreman who will lead you and guide you. Be organized and be very patient with each other, because it will be emotional." (Italics added.)[17]

Later, the prosecutor stated: "What I want to do is just say a couple things to you. First of all, for some of you, in your backgrounds, this is a very different world for you. And I think sometimes we in the criminal justice system forget[] that. We've taken you off the streets from different towns in the Bay Area and we've thrown you in here. And for some of you, you've seen some of the violence that goes on, you know. *You have street smarts*.

"So those of you who aren't exposed to this, *listen to your fellow jurors who know what's going on*. You listen and you be very patient, don't have a set opinion right off the bat, you listen and you talk about it." (Italics added.)

Defendant did not object to this line of argument and accordingly cannot argue on appeal that it constituted misconduct. Assuming the claims were properly preserved, we find no misconduct. Section 1089 provides for removing a sitting juror. It provides in pertinent part: "If at any time . . . a juror . . . upon . . . good cause shown to the court is found to be unable to perform his duty, or if a juror requests a discharge and good cause appears

---

[17]As noted, *post*, in part II.B.4., this argument had an effect on Juror No. 9, who asked to be excused.

therefor, the court may order him to be discharged and draw the name of an alternate . . . ." To the extent the prosecutor's argument merely echoed this statute, it was not misconduct. The prosecutor's chosen language admittedly flirted with the great danger of coercing the jury to a particular verdict. (The trial court later remarked that "it basically was an improper argument as such.") Were we able to characterize the prosecutor's argument as actually encouraging those jurors disposed to vote for life to remove themselves from the jury, thereby paving the way for a death verdict, we would be obligated to conclude the argument abridged defendant's right to a fair trial. (Cf. *People v. Gainer, supra,* 19 Cal.3d 835 [instructing minority jurors to reconsider their position in light of the views of the majority jurors denies constitutional right to a unanimous jury verdict].) Although we find the prosecutor's argument did not cross this line, we advise against such arguments, leaving the question of discharging jurors to the trial court and not the litigants.

We reach the same result regarding defendant's contention that the prosecutor's argument encouraged jurors to defer to the judgment of those jurors possessing "street smarts." It is unclear what the prosecutor meant by this argument, but clearly she was suggesting that those jurors with "street smarts" had some greater ability to evaluate accurately whether defendant deserved to live or die. Defendant contends the prosecutor "told jurors who might have open minds about their penalty determination and who might feel sympathy for [defendant] to defer to other jurors who would not be swayed by sympathy . . . ." We disagree this was the obvious import of the prosecutor's words because it is inconsistent with the prosecutor's almost simultaneous exhortation to "listen to your fellow jurors who know what's going on," to "be very patient, don't have a set opinion right off the bat, you listen and you talk about it." We also disagree with defendant's further claim that the prosecutor's argument encouraged jurors to go outside the evidence to decide the appropriate penalty, for the gist of the prosecutor's entire argument was that the evidence in aggravation justified the death penalty. In short, although the prosecutor's argument was potentially misleading, we find no reasonable possibility on this record that the jury was misled as to its proper duties.[18]

### 3. *The Trial Court's Disparaging Remarks*

 Defendant contends the trial court made disparaging remarks about his mental health expert in front of the jury, thereby usurping the

---

[18]Because we find it unlikely the jury was misled, we also conclude the prosecutor's argument did not unreasonably skew the deliberative process and thereby render the trial fundamentally unreliable, or deprive defendant of a fair and impartial jury in violation of his federal constitutional rights. (U.S. Const., 5th, 6th, 8th & 14th Amends.)

jury's factfinding role. In addition, by expressing its view that his mitigating evidence should not seriously be considered, he claims the trial court "display[ed] a deep-seated favoritism" for the prosecution "that would make [a] fair judgment impossible." (*Liteky v. United States* (1994) 510 U.S. 540, 555 [114 S.Ct. 1147, 1157, 127 L.Ed.2d 474].) As a result, defendant claims the trial court violated his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

As with many of his prior claims of error, defendant failed to object and thus failed to preserve the issue for appellate review. (*People v. Fudge, supra,* 7 Cal.4th at p. 1108 [must preserve claim of judicial misconduct by objecting at trial].) Assuming the issue is properly before us, we find no judicial misconduct.

The trial court's statements challenged here came when defense counsel undertook redirect examination of Dr. Rosenthal, having unsuccessfully objected to the prosecutor's use of hypothetical questions on cross-examination that asked Dr. Rosenthal to assume facts not in evidence. (See, *ante,* pt. II.B.2.b.) Defense counsel tried to use what he apparently believed was the same tactic:

"BY MR. CANNADY [defense counsel]:

"Q. So if we had a report that said Mr. Boyette saved the life of the district attorney, that would be a social behavior, right, not antisocial?

"A. That's correct.

"Q. Okay. And if we had a report that said you know, Mr. Boyette was out there and helped three police officers who were in serious danger, that would be social behavior, right?

"A. That would be.

"MS. DRABEC [the prosecutor]: I object, unless there's some report showing that.

"THE COURT: I don't think there's any.

"MR. CANNADY: There—

"THE COURT: *There's no evidence, he's making it up, which is basically a sham, sir.*

"MS. DRABEC: That's improper.

"MR. CANNADY: Same sham the prosecutor is running, your Honor.

"MS. DRABEC: Your Honor—

"THE COURT: There is no sham there.

"MR. CANNADY: Yes, there is, your Honor, there's been no evidence or testimony to—

"MS. DRABEC: Counsel obviously does not understand that I can give any basis of fact that I have a good faith belie[f] in.

"THE COURT: In cross-examination she's perfectly proper. *The doctor hasn't really said anything at all.*

"MR. CANNADY: That's for the jury to decide, your Honor." (Italics added.)

█ "When . . . the trial court persists in making discourteous and disparaging remarks to a defendant's counsel and witnesses and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge, and in other ways discredits the cause of the defense, it has transcended so far beyond the pale of judicial fairness as to render a new trial necessary." (*People v. Mahoney* (1927) 201 Cal. 618, 627 [258 P. 607]; see also *People v. Fudge, supra,* 7 Cal.4th at p. 1107, quoting *Mahoney* with approval.) █ Although respondent contends the trial court's comments were permissible because they were "accurate, temperate, and 'scrupulously fair' " comment on the evidence (*People v. Melton* (1988) 44 Cal.3d 713, 735 [244 Cal.Rptr. 867, 750 P.2d 741]), we disagree. By stating "he's making it up, which is basically a sham" and "[t]he doctor hasn't really said anything at all," the trial court's comments might have suggested to the jury that defense counsel were engaging in misconduct and that Dr. Rosenthal's testimony was not to be believed.

Nevertheless, we find no judicial misconduct. By stating, "he's making it up," the court was referring to the basis of defense counsel's questioning, which clearly was hypothetical, there being no evidence defendant saved the district attorney's life. The jury undoubtedly understood this. Moreover, the evidence counsel was attempting to elicit from the witness was not particularly important; counsel seemed more intent on illustrating for the court why its previous ruling on the prosecutor's hypothetical questions was incorrect. As noted, any prejudice from the latter was cured by a special jury instruction informing the jury that the prosecutor had failed to present any evidence of other crimes.

The court's exclamation that "[t]he doctor hasn't really said anything at all" was immediately clarified by the court's questioning the witness itself:

"THE COURT: He's too young to diagnose, is that what you're saying?

"THE WITNESS: To classically diagnose a personality disorder, you really can't do that in adolescence. [¶] . . . [¶]

"THE COURT: You're saying you yourself cannot make that diagnosis?

"THE WITNESS: I won't.

"THE COURT: Or will not.

"THE WITNESS: I would not make that diagnosis."

In context, then, it is clear the witness clarified his testimony, and the trial court's statement (that the witness "hasn't really said anything at all") merely meant that the witness had not made a diagnosis of a personality disorder. Because we find no judicial misconduct, we also reject defendant's further claims that he was denied his constitutional right to a fair trial and a reliable penalty determination.

### 4. *Excusal of Juror No. 9*

Following the prosecutor's argument suggesting that jurors who felt unable to continue could be excused (see *ante*, pt. II.B.2.e.), but prior to defense counsel's closing argument, Juror No. 9 came forward and asked to be excused. He gave somewhat conflicting reasons for his request. First, he admitted he already had made up his mind. Then he said: "The problem is, I cannot make up my mind on either side." He also stated, "I haven't made up my mind that either choice to me is not acceptable," and then said, "I can see at some level that logically I should be able to [weigh the mitigating and aggravating evidence], but the choices available to me at this point, I'm having [a] problem with, because I'm not—I'm not clear either choice is appropriate." He said he would continue if the trial judge wished him to, but asked, "Would it be fair for me to go up there and my fellow jurors seem bent on one way and I'm bent on another and then there would be no conclusion because I already made up my mind, maybe?" He further explained: "Sir, what I'm saying, essentially, is that since because of the evidence presented the last couple days, I have reached a subjective sense of the defendant's past and I have tied it to some of my experiences raising my own son. I would have [a] hard time being—objectively reaching the conclusion." When asked whether he "would have a difficult time being objective in weighing the aggravation versus the mitigation," he answered in the

affirmative. He stated several times he could not remain objective. The prosecutor stated, "I believe the record's crystal clear that he cannot deliberate . . . ." After a brief voir dire by defense counsel, the trial court excused the juror.

Defendant did not object and thus failed to preserve the issue for appeal. (*People v. Sanders* (1995) 11 Cal.4th 475, 541, fn. 28 [46 Cal.Rptr.2d 751, 905 P.2d 420]; *People v. Ashmus* (1991) 54 Cal.3d 932, 987, fn. 16 [2 Cal.Rptr.2d 112, 820 P.2d 214].) Assuming we may reach the issue, we find no abuse of discretion. As noted, *ante*, in part II.B.2.e., section 1089 sets forth the procedure for removing a sitting juror. It provides in pertinent part: "If at any time . . . a juror . . . upon . . . good cause shown to the court is found to be unable to perform his duty, or if a juror requests a discharge and good cause appears therefor, the court may order him to be discharged and draw the name of an alternate . . . ." ▬ We recently explained that we review a trial court's determination to discharge a juror by applying an abuse of discretion standard and will uphold that decision if there is substantial evidence supporting it. We also require a juror's inability to perform as a juror to appear in the record as a " ' "demonstrable reality." ' " (*People v. Cleveland* (2001) 25 Cal.4th 466, 474 [106 Cal.Rptr.2d 313, 21 P.3d 1225]; *People v. Williams* (2001) 25 Cal.4th 441, 448 [106 Cal.Rptr.2d 295, 21 P.3d 1209].)[19]

▬ We find the court did not abuse its discretion. Juror No. 9 made clear he no longer could be objective. Although he understood his role as a juror was to weigh the aggravating evidence against the mitigating evidence, he explained that emotional connections between the penalty phase evidence and his own relationship with his son convinced him to vote a certain way before he heard the defense closing argument. He also suggested that

---

[19]Defendant cites older cases such as *People v. Collins* (1976) 17 Cal.3d 687 [131 Cal.Rptr. 782, 552 P.2d 742], limited on another ground in *People v. Fields* (1983) 35 Cal.3d 329, 351, fn. 9 [197 Cal.Rptr. 803, 673 P.2d 680], for the rule that the trial court " 'has at most *a limited discretion* to determine that the facts show an inability to perform the functions of a juror, and that inability must appear in the record as a demonstrable reality.' " (*People v. Collins, supra*, at p. 696, italics added, quoting *People v. Compton* (1971) 6 Cal.3d 55, 60 [98 Cal.Rptr. 217, 490 P.2d 537].) The more modern rule provides that, under section 1089, a trial court "has *broad discretion* to investigate and remove a juror in the midst of trial where it finds that, for any reason, the juror is no longer able or qualified to serve." (*People v. Millwee* (1998) 18 Cal.4th 96, 142, fn. 19 [74 Cal.Rptr.2d 418, 954 P.2d 990], italics added; see also *People v. Cunningham* (2001) 25 Cal.4th 926, 1029 [108 Cal.Rptr.2d 291, 25 P.3d 519] [decision to remove juror reviewed for abuse of discretion]; *People v. Marshall, supra*, 13 Cal.4th at p. 843 [same]; *People v. Ray* (1996) 13 Cal.4th 313, 343 [52 Cal.Rptr.2d 296, 914 P.2d 846] [same]; *People v. Beeler* (1995) 9 Cal.4th 953, 989 [39 Cal.Rptr.2d 607, 891 P.2d 153] [same]; but see *People v. Cleveland, supra*, 25 Cal.4th 466, 487-488 (conc. opn. of Werdegar, J.) [requirement that inability to perform be shown on the record to a demonstrable reality indicates we require a "stronger evidentiary showing" than mere substantial evidence].)

discussion with his fellow jurors would not make a difference. We assume the trial court assessed the juror's sincerity. The record thus shows to a demonstrable reality that Juror No. 9 could no longer remain objective and follow the trial court's instructions to keep an open mind. There was thus substantial evidence supporting the court's decision to discharge Juror No. 9 and seat an alternate juror.[20]

### 5. *Alleged Restriction of Closing Argument*

■ Following the prosecutor's argument suggesting defendant would kill again if sentenced to life in prison without the possibility of parole, defense counsel attempted to argue that the conditions of maximum security prisons would make future violence unlikely. Thus, counsel began: "I have a friend that runs Pelican Bay [State Prison]. Pelican Bay is probably the maximum—" The prosecutor objected on the ground that there was no evidence about the prison. The trial court agreed and sustained the objection. Defendant contends the court's refusal to permit defense counsel to rebut the prosecutor's argument concerning future dangerousness with argument that defendant would not be dangerous in the confinement of a maximum security prison denied him his federal constitutional rights to due process, a fair trial, and a reliable and individualized penalty determination. (U.S. Const., 5th, 6th, 8th & 14th Amends.)

To the extent defendant relies on *Skipper v. South Carolina* (1986) 476 U.S. 1 [106 S.Ct. 1669, 90 L.Ed.2d 1] (capital defendant entitled to have jury consider any relevant mitigating evidence) to argue he was prevented from presenting evidence to rebut the assertions of future dangerousness, we reject the argument because the premise is flawed. He was not prevented from *introducing evidence*, but merely was prevented from *presenting argument* to that effect. Further, because counsel's proposed argument was based on evidence outside the record, the trial court did not abuse its discretion in sustaining the prosecutor's objection. The right to present closing argument at the penalty phase of a capital trial, while broad in scope, "is not unbounded . . . ; the trial court retains discretion to impose reasonable time limits and to ensure that argument does not stray unduly from the mark." (*People v. Marshall, supra,* 13 Cal.4th at pp. 854-855.) It is improper to state facts not in evidence, unless such facts were subject to judicial notice or are "matters of common knowledge or illustrations drawn from experience, history, or literature." (*People v. Farmer* (1989) 47 Cal.3d 888, 922 [254 Cal.Rptr. 508, 765 P.2d 940], overruled on another ground in *People v.*

---

[20]Finding legal grounds to discharge the juror, we also reject defendant's subsidiary claims that the discharge denied him his federal constitutional rights to due process, a fair trial, freedom from double jeopardy, and to a state-created liberty interest.

*Waidla* (2000) 22 Cal.4th 690, 724, fn. 6 [94 Cal.Rptr.2d 396, 996 P.2d 46].) The security conditions at Pelican Bay State Prison fall into none of these categories. Finally, we reject the claim that defendant was entitled to pursue this line of argument because the prosecutor was allowed to argue future dangerousness. The prosecutor's argument in this regard was based on the facts of the case, namely the evidence showing defendant mercilessly executed defenseless victims, and was thus permissible. We find no constitutional violation.

### 6. *CALJIC No. 8.88*

Defendant next claims CALJIC No. 8.88[21] is unconstitutional for a variety of reasons. He admits we have rejected all these claims in prior cases and asserts he is raising them in this court to exhaust his state remedies to permit him to renew these claims in federal court. (See, e.g., *Rose v. Lundy* (1982) 455 U.S. 509 [102 S.Ct. 1198, 71 L.Ed.2d 379].) We agree none of the claims has merit and that no reason appears to reconsider our past decisions. We list defendant's claims here to ensure a future court will consider them fully exhausted:

---

[21]CALJIC No. 8.88, as read to the jury, provided: "It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole shall be imposed on the defendant. [¶] After having heard all of the evidence and having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravation and mitigating circumstances upon which you have been instructed. [¶] An aggravating factor is any fact, condition, or event attending the commission of a crime which increases its guilt or enormity or adds to its injurious consequences. [¶] A mitigating circumstance is any fact, condition or event which, as such, does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty. [¶] The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. [¶] In weighing the various circumstances, you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. [¶] If you should find that the mitigating circumstances outweigh the aggravating circumstances, you must return a sentence of confinement in the state prison for life without the possibility of parole. [¶] If you find that the aggravating and mitigating circumstances are of relatively equal value in your minds, you must return a sentence of confinement in the state prison without the possibility of parole. [¶] If you find that the aggravating circumstances outweigh the mitigating circumstances, you may return a sentence of death or you may return a sentence of life imprisonment without the possibility of parole. But, in order to return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole. [¶] You shall now retire and select one of your number to act as foreperson who will preside over your deliberations. In order to make a determination as to the penalty, all 12 jurors must agree. Any verdict that you reach must be dated and signed by your foreperson on a form that will be provided and then you shall return with it to this courtroom."

— The instruction is faulty for failing to direct the jury to consider coperpetrator Antoine Johnson's life sentence when determining defendant's penalty. (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1251 [9 Cal.Rptr.2d 628, 831 P.2d 1210].)

— The instruction's use of the phrase "so substantial" is vague and violates the Eighth Amendment to the United States Constitution. (*People v. Gurule* (2002) 28 Cal.4th 557, 662 [123 Cal.Rptr.2d 345, 51 P.3d 224]; *People v. Ochoa* (2001) 26 Cal.4th 398, 452 [110 Cal.Rptr.2d 324, 28 P.3d 78].)

— The instruction's use of the term "warrants" is so overbroad it misleads the jury to believe it may impose the death penalty even when it concludes it is not the appropriate penalty. (*People v. Breaux* (1991) 1 Cal.4th 281, 316 [3 Cal.Rptr.2d 81, 821 P.2d 585].)

— The instruction fails to specify that the prosecution has the burden of persuasion. (*People v. Jackson, supra*, 13 Cal.4th at p. 1244.)

— The instruction fails to require the jury to find beyond a reasonable doubt that the aggravating factors outweigh the mitigating ones and that death is the appropriate penalty. (*People v. Stankewitz* (1990) 51 Cal.3d 72, 109-110 [270 Cal.Rptr. 817, 793 P.2d 23].)

— The instruction fails to require that the jury unanimously find which aggravating circumstances are true. (See, e.g., *People v. Jenkins* (2000) 22 Cal.4th 900, 1053 [95 Cal.Rptr.2d 377, 997 P.2d 1044] [unanimity not required].)

— The instruction fails to require a statement of reasons supporting the death verdict. (*People v. Kipp* (1998) 18 Cal.4th 349, 381 [75 Cal.Rptr.2d 716, 956 P.2d 1169].)

### 7. *Constitutional Challenges to the Death Penalty Law*

Defendant next raises several claims that our state's death penalty law is unconstitutional "in its formulation and application," citing his rights to due process, liberty, equal protection, to a nonarbitrary and reliable penalty determination, and to be free of cruel and unusual punishment under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution. He admits we have rejected these claims in prior cases, and we do so again here, finding he states no reason to reconsider our prior decisions. Defendant claims the death penalty law is unconstitutional because it:

— Fails to provide for intracase proportionality review. To the extent defendant claims the law must allow for a comparison between his punishment and that of Antoine Johnson, his partner in crime who he claims received a life sentence, we disagree. (*People v. Riel* (2000) 22 Cal.4th 1153, 1223 [96 Cal.Rptr.2d 1, 998 P.2d 969].)[22]

— Fails to designate which factors should be considered aggravating and which should be considered mitigating (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1064 [90 Cal.Rptr.2d 607, 988 P.2d 531]) and uses an undifferentiated " 'unitary list' " of sentencing factors permitting the jury complete discretion to impose a penalty (*People v. Bolin, supra,* 18 Cal.4th at p. 341).

— Treats the absence of a mitigating factor as aggravating (*Weaver, supra,* 26 Cal.4th at p. 993), especially because the law asks the jury to consider "whether or not" certain mitigating factors are present (*People v. Bolin, supra,* 18 Cal.4th at p. 342).

— Permits the consideration of nonstatutory aggravating factors. (*Weaver, supra,* 26 Cal.4th at p. 993; see *People v. Boyd, supra,* 38 Cal.3d at p. 775.)

— Fails to require the jury to find that the aggravating factors outweigh the mitigating ones, and that death is the appropriate penalty, beyond a reasonable doubt. (*Weaver, supra,* 26 Cal.4th at p. 992.)

— Fails to impose a burden of proof for the penalty phase. (*Weaver, supra,* 26 Cal.4th at p. 992.)

— Fails to require the jury to find the existence of an aggravating factor unanimously and beyond a reasonable doubt before considering it. (*Weaver, supra,* 26 Cal.4th at p. 992 [unanimity not required]; *People v. Kraft, supra,* 23 Cal.4th at p. 1078 [beyond a reasonable doubt not required].)

— Fails to require written findings. (*Weaver, supra,* 26 Cal.4th at p. 992.)

— Fails to inform the jury it need not be unanimous in relying on a mitigating circumstance. (See *Weaver, supra,* 26 Cal.4th at p. 988 [standard instruction not reasonably susceptible to the interpretation that unanimity required for consideration of mitigating factors].)

---

[22]To the extent defendant contends the death penalty law violates his constitutional right to equal protection because it does not guarantee some sort of disparate sentence review that was in the past given to noncapital convicts under the Determinate Sentencing Act (§ 1170, former subd. (f) as amended by Stats. 1988, ch. 635, § 1, p. 2210), we disagree. (*People v. Keenan* (1988) 46 Cal.3d 478, 545 [250 Cal.Rptr. 550, 758 P.2d 1081].)

— Prevents the full consideration of moral justification as a mitigating factor under section 190.3, factor (f) by qualifying the factor with the phrase "reasonably believed." (*People v. Jenkins, supra*, 22 Cal.4th at p. 1055.)

— Prevents the full consideration of mental disturbance as a mitigating factor under section 190.3, factor (d), and duress as a mitigating factor under section 190.3, factor (g), by qualifying both factors with the term "extreme." (*Weaver, supra*, 26 Cal.4th at p. 993.)

— Uses vague terms, such as "extreme." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1138 [113 Cal.Rptr.2d 27, 33 P.3d 450]; see *Blystone v. Pennsylvania* (1990) 494 U.S. 299, 308 [110 S.Ct. 1078, 1084, 108 L.Ed.2d 255] [use of word "extreme" in Pennsylvania death penalty statute not unconstitutionally vague].)

— Uses the term "impaired" in section 190.3, factor (h) ("Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the affects of intoxication"), which suggests the illness caused the crime. (*People v. Marshall, supra*, 13 Cal.4th at p. 857 [for § 190.3, factor (h) to apply, "the evidence supporting it need not suffice to establish a complete defense to the crime; rather, there need be in the record only some evidence relevant to the factor"].)

— Fails rationally to narrow the class of those eligible for the death penalty. (*Weaver, supra*, 26 Cal.4th at p. 992.)

— Gives prosecutors "unbounded" discretion in deciding when to charge a murder case as a capital case. (*Weaver, supra*, 26 Cal.4th at p. 992.)

— Lacks intercase proportionality. (*Weaver, supra*, 26 Cal.4th at p. 992.)

8. *Cumulative Error*

 Defendant finally contends reversal is required because of the cumulative prejudice arising from all the errors that occurred in his trial. It is not unusual in a complicated capital trial to find some errors, and this case is typical. As noted, we find the trial court should have excused Prospective Juror K.C. for cause, and it improperly limited the questioning of Marcia Surrell. We also find the prosecutor should not have commented on defendant's courtroom demeanor. In addition, the prosecutor's hypothetical questions involving a White assault victim, prison assaults, Carter's alleged final

words, and defendant's alleged knife assault on his grandfather were improper, as were her statements in closing argument at the penalty phase suggesting she had additional evidence in aggravation that she had not presented and that defendant should have taken the stand to express remorse. Most of these missteps were minor, and none was prejudicial by itself. We also find that the combined effect of these errors was harmless and that defendant did not otherwise endure an unfair trial.

### III. CONCLUSION

The judgment is affirmed in its entirety.

George, C. J., Baxter, J., Chin, J., Brown, J., and Moreno, J., concurred.

**KENNARD, J.**—I dissent.

During jury selection in this death penalty case, the defense objected to the prosecution's exercise of peremptory challenges against four African-American women, asserting that the challenges were purposefully discriminatory on the basis of the prospective jurors' race and gender. The trial court said it did not think a prima facie case had been shown and asked the prosecutor if she wanted to explain her challenges. The prosecutor responded she had challenged these prospective jurors because she thought they could not vote for the death penalty. The trial court then ruled on the objection, with these words: "As I say, I don't think a prima facie case has been shown. [¶] I would have to agree with the district attorney on her challenges of the four Black African-American women, that I did not believe they were persons who would vote for the penalty of death based upon their questionnaires and their answers [during voir dire]."

The use of peremptory challenges to eliminate prospective jurors because of their race or gender is prohibited by the federal Constitution (*J. E. B. v. Alabama ex rel. T. B.* (1994) 511 U.S. 127, 129 [114 S.Ct. 1419, 1421-1422, 128 L.Ed.2d 89]; *Powers v. Ohio* (1991) 499 U.S. 400, 409 [111 S.Ct. 1364, 1369-1370, 113 L.Ed.2d 411]; *Batson v. Kentucky* (1986) 476 U.S. 79, 89 [106 S.Ct. 1712, 1719, 90 L.Ed.2d 69]) and by the California Constitution (*People v. Wheeler* (1978) 22 Cal.3d 258, 276-277 [148 Cal.Rptr. 890, 583 P.2d 748]). Trial courts must use a three-step process to evaluate a defendant's claim that the prosecutor has purposefully discriminated in the exercise of peremptory challenges. First, the defendant must make a prima facie case of improper discrimination. Second, the prosecutor must come forward with a race-neutral explanation for the challenges. Third, the trial court must decide whether the defendant has carried the burden of proving purposeful

discrimination. (*Purkett v. Elem* (1995) 514 U.S. 765, 767 [115 S.Ct. 1769, 1770-1771, 131 L.Ed.2d 834]; *Hernandez v. New York* (1991) 500 U.S. 352, 358-359 [111 S.Ct. 1859, 1865-1866, 114 L.Ed.2d 395] (plur. opn. of Kennedy, J.).)

Here, the majority asserts that the "dispositive question" is "whether defendant demonstrated a prima facie case of group bias." (Maj. opn., *ante,* at p. 422.) The majority is wrong. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." (*Hernandez v. New York, supra,* 500 U.S. 352, 359 [111 S.Ct. 1859, 1866] (plur. opn. of Kennedy, J.).) Here, the prosecutor gave a race-neutral and gender-neutral explanation for the peremptory challenges of the four African-American women. The prosecutor said she thought these prospective jurors could not vote for the death penalty. The trial court then ruled on the ultimate issue of purposeful discrimination. The trial court said: "I would have to agree with the district attorney on her challenges of the four Black African-American women, that I did not believe they were persons who would vote for the penalty of death based upon their questionnaires and their answers [during voir dire]." This ruling on the ultimate question renders moot the preliminary question whether defendant had made a prima facie case.

In support of its assertion that the existence of a prima facie case is the dispositive issue, the majority relies on earlier decisions of this court holding that when a trial court has expressly found that a prima facie case has not been shown, the sufficiency of the defendant's initial showing is not rendered moot by the trial court's later determination that the prosecution has supplied race-neutral and genuine explanations. (*People v. Welch* (1999) 20 Cal.4th 701, 746 [85 Cal.Rptr.2d 203, 976 P.2d 754]; *People v. Mayfield* (1997) 14 Cal.4th 668, 723 [60 Cal.Rptr.2d 1, 928 P.2d 485]; *People v. Turner* (1994) 8 Cal.4th 137, 166-167 [32 Cal.Rptr.2d 762, 878 P.2d 521].) But these decisions are contrary to the overwhelming weight of authority in other jurisdictions on this issue of federal constitutional law. (See *Stubbs v. Gomez* (9th Cir. 1999) 189 F.3d 1099, 1104; *U.S. v. Sneed* (10th Cir. 1994) 34 F.3d 1570, 1579-1580; *Smith v. State* (Ala.Crim.App. 2000) 797 So.2d 503, 522; *People v. Davis* (Colo.Ct.App. 1996) 935 P.2d 79, 82; *People v. Martinez* (1998) 297 Ill.App.3d 328, 335 [231 Ill.Dec 475, 696 N.E.2d 771, 775-776]; *Koo v. State* (Ind.Ct.App. 1994) 640 N.E.2d 95, 99; *State v. Durham* (La.Ct.App. 1996) 673 So.2d 1103, 1111; *Manning v. State* (Miss. 1998) 726 So.2d 1152, 1182-1183, overruled on an unrelated point in *Weatherspoon v. State* (Miss. 1999) 732 So.2d 158, 162; *State v. White*

(Mo.Ct.App. 1992) 835 S.W.2d 942, 950; *People v. Dalhouse* (1997) 240 A.D.2d 420, 420-421 [658 N.Y.S.2d 408, 410]; *State v. Williams* (2002) 355 N.C. 501, 550-551 [565 S.E.2d 609, 638-639]; *Neill v. State* (Okla.Crim.App. 1994) 896 P.2d 537, 546, fn. 4; *State v. Ruiz-Martinez* (2001) 173 Or.App. 202, 205 [21 P.3d 147, 148]; *Malone v. State* (Tex.Crim.App. 1996) 919 S.W.2d 410, 412.)

This court has never reconsidered this issue of federal constitutional law in light of these conflicting decisions from other jurisdictions. These decisions persuade me that when the trial court has heard the reasons for the peremptory challenge and ruled on the ultimate question of intentional discrimination, a reviewing court should not concern itself with whether a prima facie case has been demonstrated, regardless of the presence or absence of an express finding on the existence of a prima facie case. Instead, the reviewing court should proceed to review the trial court's ruling on the ultimate question. Accordingly, I review the trial court's ruling that the prosecutor did not purposefully discriminate in the exercise of peremptory challenges.

Here, in reviewing the trial court's ruling on the question of purposeful discrimination, it is not necessary to consider each of the four African-American women because "[t]he exclusion by peremptory challenge of a single juror on the basis of race or ethnicity is an error of constitutional magnitude requiring reversal." (*People v. Silva* (2001) 25 Cal.4th 345, 386 [106 Cal.Rptr.2d 93, 21 P.3d 769].) Here, the trial court erred in denying the defense motion at least as to Prospective Juror B.W.

Nothing in the transcript of voir dire supports the prosecutor's assertion that B.W. could not return a death verdict. As the majority acknowledges (maj. opn., *ante*, at p. 422), B.W.'s responses on voir dire were those of a person who was open to voting to impose the death penalty.

On voir dire by the trial court, B.W. reaffirmed statements she made on her questionnaire that she was "moderately in favor of the death penalty" and that "if it were on the ballot, [she] would vote for the proposition that California should have a death penalty." Under further voir dire by the court, she said that, depending on the evidence introduced at the penalty phase, she could vote for the death penalty in a case in which the defendant was guilty of two counts of first degree murder with multiple-murder and perhaps also lying-in-wait special circumstances. She affirmed that in such a case she could vote for the death penalty if she concluded it was appropriate based on a weighing of aggravating and mitigating circumstances.

The prosecutor asked B.W. on voir dire whether, "if [she] felt death was morally appropriate," she thought she could "com[e] down in open court at

the conclusion of the case with the other jurors" and announce a verdict that would be "Yes, I vote to have you executed, Mr. Boyette"? B.W. answered, "Yes." She also agreed that in deciding the issue of penalty she would consider mitigating aspects of defendant's background and circumstances in aggravation including the facts of the crime.

As the majority observes, in one of her answers on the questionnaire, B.W. "expressed some impatience with the death penalty" by "noting the length of time some inmates spend on death row." (Maj. opn., *ante*, at p. 422.) The questionnaire asked whether the prospective juror thought the death penalty was imposed "too often," "too seldom," "randomly," or "about right." B.W. circled "randomly," with this explanation: "Look at death row. People have been waiting for years. You shouldn't have death row if death never comes."

The majority never explains why a prosecutor would consider a prospective juror's impatience with delays in carrying out death sentences to be evidence that the juror would be reluctant to vote for a death sentence in this or any other case. Persons moderately or strongly in favor of the death penalty, not persons reluctant to impose it, would be most likely to express impatience with delays in executions. Significantly, the prosecutor did not ask B.W. about this questionnaire response during voir dire.

The majority also asserts that "neither the prosecutor nor the trial court was required to take the jurors' answers at face value." (Maj. opn., *ante*, at p. 422.) But neither the prosecutor nor the trial court said that B.W.'s answers were not credible or were belied by her facial expressions or demeanor. On the contrary, the trial court said it reached its conclusion about the challenged jurors' death penalty views "based upon their questionnaires and their answers [during voir dire]." A reviewing court may not infer that peremptory challenges were based on a prospective jurors' demeanor when the prosecutor never articulated that justification. (*Turner v. Marshall* (9th Cir. 1997) 121 F.3d 1248, 1254.)

When a prosecutor has given a facially nondiscriminatory reason for a peremptory challenge, the ultimate issue of purposeful discrimination turns on the credibility of the prosecutor's explanation, and the trial court has a duty to make that credibility determination. (*People v. Silva, supra,* 25 Cal.4th at p. 385.) In doing so, the court must consider whether the record supports the prosecutor's stated reason. "Where the facts in the record are objectively contrary to the prosecutor's statements, serious questions about the legitimacy of a prosecutor's reasons for exercising peremptory challenges are raised. [Citations.] The fact that one or more of a prosecutor's

justifications do not hold up under judicial scrutiny militates against the sufficiency of a valid reason." (*McClain v. Prunty* (9th Cir. 2000) 217 F.3d 1209, 1221.)

A trial court "should be suspicious when presented with reasons that are unsupported or otherwise implausible." (*People v. Silva, supra,* 25 Cal.4th at p. 385.) In this situation, a trial court should point out inconsistencies and ask probing questions to determine whether the stated reason is genuine or pretextual. Here, because B.W.'s juror questionnaire answers and voir dire responses provided little or no support for the prosecutor's assertion that she would have difficulty voting for a death sentence, the trial court had a duty to inquire further, but it did not. Had the court inquired further, the prosecutor might have given some additional response providing a sufficient basis for concluding that her stated reason was genuine rather than pretextual. Because the trial court did not make " 'a sincere and reasoned attempt to evaluate the prosecutor's explanation' " (*ibid.,* quoting *People v. Hall* (1983) 35 Cal.3d 161, 167-168 [197 Cal.Rptr. 71, 672 P.2d 854]), the prosecutor was never afforded that opportunity.

Because the prosecutor's stated reason for challenging B.W. is not fairly supported by the record, and because the trial court did not probe further to find a satisfactory explanation for this discrepancy, the court's credibility determination is not fairly supported by the record and the court erred in denying defendant's motion as to Prospective Juror B.W. Through this error, defendant was denied the right to a fair trial in violation of the equal protection clause of the federal Constitution (*Batson v. Kentucky, supra,* 476 U.S. 79, 84-89 [106 S.Ct. 1712, 1716-1719]) and his right under the state Constitution to a trial by a jury drawn from a representative cross-section of the community (*People v. Wheeler, supra,* 22 Cal.3d 258, 276-277).

For these constitutional violations, I would reverse the judgment.

Appellant's petition for a rehearing was denied February 11, 2003, and the opinion was modified to read as printed above. Kennard, J., was of the opinion that the petition should be granted.